IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELAINE T. PROSA,

 *Plaintiff*,

v.

LLOYD J. AUSTIN, III,
SECRETARY, UNITED STATES
DEPARTMENT OF DEFENSE,

 *Defendant*.

Civil Action No. ELH-20-3015

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Elaine T. Prosa, an employee of the

United States Department of the Air Force (the "Department"), filed suit against Barbara Barrett,

then the Secretary of the Department, alleging employment discrimination in violation of Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and

Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. (the "Rehabilitation Act").[1]  ECF 1 (the

"Complaint").[2]

Specifically, the Complaint lodges seven counts: discrimination on the basis of sex, in

violation of Title VII (Count I); discrimination on the basis of plaintiff's association with African

---

[1] Plaintiff also refers to the Rehabilitation Act as the Vocational Rehabilitation Act of 1973 or the "VRA."

[2] In its Motion, defendant asserts, without explanation, that because Secretary of Defense Lloyd J. Austin III assumed office following the filing of this suit, he should automatically be substituted as the defendant, pursuant to Fed. R. Civ. P. 25(d). *See* ECF 13 at 1 n.1. It is not clear to the Court why Austin, as the Secretary of Defense, should be substituted for Barrett, the former Secretary of the Air Force. Nevertheless, plaintiff appears to accept defendant's premise, altering the caption in her subsequent submissions to identify Austin as the defendant. And, this issue does not appear to be material in any way. Therefore, the Court will defer to the parties and direct the Clerk to substitute Austin as defendant.

Americans, in violation of Title VII (Count II); retaliation, in violation of Title VII (Count III); discrimination on the basis of plaintiff's association with a person with a disability, in violation of the Rehabilitation Act (Count IV); retaliation, in violation of the Rehabilitation Act (Count V); hostile work environment, based on gender, race, and retaliation, in violation of Title VII (Count VI); and hostile work environment, based on disability and retaliation, in violation of the Rehabilitation Act (Count VII).

Defendant has filed a motion to dismiss for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, for summary judgment.  ECF 13.  The motion is supported by a memorandum (ECF 13-1) (collectively, the "Motion"), as well as fourteen exhibits.  ECF 13-2 to ECF 13-15.  Plaintiff opposes the Motion (ECF 18, the "Opposition"), supported by four exhibits. ECF 18-2 to ECF 18-5.  In addition, plaintiff has filed a motion asking the Court to deny or defer ruling on the Motion to permit the parties to engage in discovery (ECF 19), supported by a memorandum (ECF 19-1) (collectively, the "Discovery Motion") and a Declaration by plaintiff under Fed. R. Civ. P. 56(d).  ECF 19-2.  Defendant has replied in support of the Motion (ECF 22, the "Reply"), supported by two exhibits.  ECF 22-1; ECF 22-2.  The Reply includes defendant's opposition to the Discovery Motion.  *See* ECF 22 at 15.  And, plaintiff has replied (ECF 23), supported by three exhibits.  ECF 23-1 to ECF 23-3.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall construe the Motion as a motion to dismiss and deny it.  I shall also grant the Discovery Motion.

## I. Factual Background[3]

### A.

Plaintiff, a "Caucasian female," is a resident of Maryland who retired from the United States Army as an intelligence specialist in 2008.  ECF 1, ¶¶ 3, 12, 13.  Since retirement, plaintiff has been employed by the federal government as a civilian employee.  *Id*. ¶ 12.  In particular, between June 2012 and June 2019, plaintiff was employed by the Department as a "GS-13, Strategic Vision Specialist" with the United States Cyber Command at Fort George G. Meade in Maryland.  *Id*. ¶ 17.  Between June 2012 and late 2017, plaintiff worked in Cyber Command's "J6 organization," and in late 2017 she transferred to Cyber Command's "J2 organization."  *Id*.[4]  In early 2019, plaintiff transferred from Cyber Command to a position with the National Security Agency ("NSA").  *Id*.

Plaintiff's allegations as to improper treatment principally center on the conduct of her immediate supervisor, Todd Meredith, beginning in January 2016.  *See id*. ¶ 20.  She also makes allegations relating to two other supervisors or managers, Lewis Schulz and Colonel Hewett S. Wells.  *See id*. ¶¶ 24, 25.  Schulz is identified as Meredith's immediate supervisor.  *Id*. ¶ 27.  Wells's specific role is not identified in the Complaint.  But, another document I may consider identifies him as "Director, C4 Systems & CIO Support."  ECF 13-13 at 3.

---

[3] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

[4] The Complaint does not explain the difference between J6 and J2.

Prosa alleges that she "associates with African Americans and has African American grandchildren." *Id.* ¶ 13. Further, she asserts that these relationships were known to her supervisors and managers within the Department. *Id.* During the period relevant to the Complaint, plaintiff also "associated with an individual with a disability within the meaning of the [Rehabilitation Act], her husband." *Id.* ¶ 14. Specifically, plaintiff's husband has "severe physical impairments," stemming from a cerebral hemorrhage in 2013, congestive heart failure since 2016, diabetes II, hypertension, and renal and vision failure. *Id.* Because of these disabilities, plaintiff's husband is unable to work, drive, or perform other "activities of daily living." *Id.* As a result, plaintiff has been her husband's principal caregiver, and she transports him to his medical appointments and prepares his meals and medications. *Id.* ¶¶ 14, 15. Plaintiff alleges that her husband's disabilities, and her need to assist him, were known to her supervisors and managers. *Id.* ¶¶ 14, 15.

According to Prosa, "[a]t all times during her federal employment, [she] has enjoyed a successful career and always was rated as at least a fully successful performer." *Id.* ¶ 12. Prior to the events at issue in the Complaint, she had never been disciplined and received "R" scores on her annual performance appraisals at Cyber Command, meaning that her performance was "acceptable and 'Meets Standards' on all critical elements." *Id.* ¶ 18. For example, in her mid-point appraisal for the period between April 1, 2015, and October 15, 2015, her supervisor noted that she "'needs little [to] no improvement' on performance elements and other performance measures." *Id.*

Moreover, plaintiff had a variety of professional accomplishments during her tenure at Cyber Command. *Id.* For example, she was selected as the "Capabilities Development Group" ("CDG") leader for the "Intelligence Oversight Program Manager" ("IOPM") section at Cyber

Command, a position referred to in the Complaint as "CDG IOPM." *Id.* ¶¶ 18, 44. And, in the Fall of 2015, after a supervisor suggested that plaintiff work towards a certificate from the National Defense University ("NDU"), she "enrolled in courses supporting that certification." *Id.* ¶ 19.

As noted, Meredith became plaintiff's supervisor in 2016. *Id.* ¶ 20. "He immediately interfered" with plaintiff's NDU coursework, informing her that "he would not approve compensatory time off for travel to attend classes" and that she could not perform coursework while at work. *Id.* In addition, he required plaintiff to provide him with a "final assessment paper and a justification for her attendance at the NDU classes." *Id.* According to plaintiff, these requirements contradicted her prior supervisor's directives and were not supported by Department policies, nor were they imposed on her male coworkers. *Id.*

In addition, Meredith allegedly "herded his work unit's [three] African American employees, as well as Plaintiff, who associated with African Americans, into a poorly ventilated" and small work space. *Id.* ¶ 21. Conversely, "Caucasian workers, including Alan Hunsacker, were provided spacious well-ventilated work spaces." *Id.* In addition, during a "mentoring session" with plaintiff on February 5, 2016, Meredith "impatiently demanded" that she sign an "Air Force Core Personnel document." *Id.* ¶ 22.[5] Meredith never explained the document's purpose, yet he demanded that plaintiff sign it immediately and review it later. *Id.* Moreover, he told plaintiff that "he was not happy with her asking questions and seeking clarification regarding the form." *Id.*

In addition, the Complaint asserts that plaintiff had a "history of engaging in protected activities." *Id.* ¶ 23. In particular, in early 2016, "she filed an EEO Complaint,"[6] alleging unlawful

---

[5] The contents of this document are not described.

[6] The Complaint does not define "EEO," but presumably it refers to Equal Employment Opportunity.

discrimination and retaliation, assigned Case Number 9L4W16015.  *Id.*  In addition, in March 2016, plaintiff "complained about being required to work in a hostile work environment."  *Id.* ¶ 24.  Plaintiff provided evidence, including investigatory affidavits, in an EEO proceeding brought by one of her coworkers, Dorea Morrison.  *Id.*[7]  Morrison, who is African American, accused her supervisors and managers—Meredith, Schulz, and Wells—of unlawful discrimination and retaliation.  *Id.*  She eventually was "forced to resign" because of "Meredith's abusive and hostile discriminatory and retaliatory conduct."  *Id.* ¶ 32.

According to plaintiff, prior to the time that she engaged in these "protected activities," she had "enjoyed a professional, productive, and collaborative relationship" with Meredith, Schultz, and Wells.  *Id.* ¶ 25.[8]  But, after she engaged in protected activity on behalf of Ms. Morrison, the "harsh and relentless harassment and retaliation from Meredith, Schulz and Wells" impacted "those harmonious relationships," and "the workplace became hostile and abusive and was infused with stark discriminatory and retaliatory actions by Meredith, Schulz and Wells."  *Id.*

On March 16, 2016, Meredith allegedly "screamed at Plaintiff in front of several co-workers" and sent her several "derogatory e-mails with exclamation points for emphasis, which Plaintiff equated with yelling at her."  *Id.* ¶ 26.  He did not address plaintiff's male coworkers in a similar manner.  *Id.*  Then, on April 7, 2016, Meredith informed plaintiff that she must "obtain an IA certification or risk disciplinary termination or termination."  *Id.* ¶ 27.[9]  Plaintiff's job

---

[7] The Complaint implies this also occurred in March 2016. *See* ECF 1, ¶ 24. Defendant asserts that plaintiff submitted a Declaration in the Morrison proceeding in November 2016. *See* ECF 13-2; ECF 22 at 12.

[8] But, as noted, plaintiff also alleged that her disagreements with Meredith commenced in January 2016, when he began interfering with her NDU coursework immediately upon becoming her supervisor. *See* ECF 1, ¶ 20.

[9] Curiously, "IA" is never defined in the Complaint.

description did not list such a requirement, and Meredith had told Schulz that obtaining such a certification was not a "primary requirement" for plaintiff's job.  *Id.*

In May 2016, plaintiff "learned that she was being isolated from activities in Asset Management and other policies on which she regularly had worked."  *Id.* ¶ 28.  She was excluded from meetings and discussions, and told that projects on which she had been working were being placed on hold.  *Id.*  White coworkers, and coworkers not engaged in protected activities, did not have duties removed from them by J6 managers and supervisors, nor were they "ostracized and isolated."  *Id.*

Plaintiff met with Wells for her annual performance appraisal on May 23, 2016.  *Id.* ¶ 29. Wells gave plaintiff an "R" Rating of Record, indicating that she rendered an "acceptable performance and that she 'meets standards' in all elements."  *Id.*  The same day, Meredith presented plaintiff with, and directed her to sign, "a disciplinary counseling form backdated to March 2016," contrary to Department policies.  *Id.* ¶ 30.[10]  During the meeting, plaintiff "told Meredith that she objected to being required to obtain an IA certification that was not a requirement for her job."  *Id.*  Plaintiff later found that the job description in her personnel file differed from the one Meredith had presented.  *Id.*

More issues occurred later in the summer and fall of 2016.  In July 2016, Meredith criticized plaintiff for "'over-executing'" her emails.  *Id.* ¶ 31.  On September 1, 2016, Meredith directed plaintiff to "complete the Budget Standard Operation Procedure," even though plaintiff's essential job duties did not include any budget-related responsibilities.  *Id.* ¶ 32.  After plaintiff "devoted considerable effort to that project and had it in a final form," Meredith directed her to give it to a male coworker who, according to Meredith, "needed something do so."  *Id.*

---

[10] The content of this form is not described.

On September 23, 2016, Meredith directed plaintiff to prepare a memo appointing her CDG IOPM.  *Id.* ¶ 33.  Although she did so, Meredith never signed it.  *Id.*  Plaintiff prepared an IOPM slideshow for Wells on September 27, 2017, and submitted it to Meredith for review and approval, but he ignored it.  *Id.* ¶ 34.  In October 2016, Meredith allegedly learned that "her managers and supervisors surreptitiously were taking advantage of a confidential relationship that she enjoyed with the facility's chaplain to obtain confidential information that Plaintiff had disclosed to the chaplain," although the Complaint does not go into more detail.  *Id.* ¶ 35.  On October 25, 2016, Meredith "impeded Plaintiff from receiving her SPC tab in time, creating the false perception that Plaintiff could not meet deadlines."  *Id.* ¶ 37.[11]  And, on October 27, 2016, Meredith sent plaintiff information about a Defense Intelligence Agency vacancy and suggested she apply, because she had expressed an interest in returning to one of her former positions as an analyst.  *Id.* ¶ 38.  But, plaintiff felt "threatened and intimidated" by this suggestion, because she had never informed Meredith that this was her objective.  *Id.*

Plaintiff met with Wells on October 11, 2016, to discuss her upcoming mid-point performance appraisal and to "express objections to the harassment that she was experiencing from Meredith and Schulz."  *Id.* ¶ 36.  Wells refused to address these concerns, instead directing plaintiff to resolve her issues with Meredith.  *Id.*

Then, on October 28, 2016, plaintiff met with Meredith for her mid-point performance appraisal.  *Id.* ¶ 39.  The Complaint describes this appraisal as "rife with errors and inaccuracies." *Id.*  For example, Meredith criticized plaintiff for failing to meet a deadline he had never set, yet he did not censure a male coworker who had worked with plaintiff on the same project, even though the coworker would have missed the same deadline.  *Id.*  In addition, Meredith had never

---

[11] "SPC tab" is not defined or explained in the Complaint.

reviewed plaintiff's official job description with her prior to the appraisal.  *Id*.  Following this appraisal, on November 1, 2016, Meredith directed plaintiff to sign an "AF-860 form requiring an IAM certification," but this requirement was not part of plaintiff's job description and had never been required." *Id*. ¶ 40.[12]  Furthermore, Meredith never met with plaintiff to explain his rationale for this requirement.  *Id*.

Between January and November 2016, Meredith "removed" most of plaintiff's duties.  *Id*. ¶ 41.  As a result, plaintiff met with Meredith on November 10, 2016, to request the assignment of more "duties," and told him that if he was not going to provide her with more duties, she would request a transfer.  *Id*.  Meredith responded by directing plaintiff to develop a slide presentation for Wells.  *Id*.  She reminded him that she had already submitted that project to Meredith in September 2016, but he had never approved it.  *Id*.

As of December 2016, one of plaintiff's "primary job responsibilities" was as the CDG IOPM.  *Id*. ¶ 44.  However, Meredith "actively attempted to undermine Plaintiff's IOPM duties as well as her ability to collaborate with other IOPM managers."  *Id*.  Meredith and Schulz also "thwarted" plaintiff's ability to communicate with her IOPM managers and peers.  *Id*.  On December 22, 2016, Meredith attended a meeting with IOPM section management, along with Colonel Douglas Matty, "in an effort to have Plaintiff removed as the CDG IOPM." *Id*. ¶ 45.[13]

The same day, plaintiff was "summoned" to a meeting with Meredith and Michelle Skaggs. *Id*. ¶ 46.[14]  Because of "Meredith's explosive temper and resulting fears for her safety," plaintiff

---

[12] Again, the Complaint does not define "IAM certification" or the relationship between "IAM certification" and "IA certification."

[13] Matty's position is not specified in the Complaint.

[14] Skaggs's position is not specified in the Complaint.

requested to have a human resources representative or coworker present at the meeting, and sought to open the door to "get a witness." *Id.* "As Plaintiff's hand was on the door in an effort to open it further, Meredith threw his body at the door, pushing the door to close it." *Id.* The force of Meredith's body weight caused the door to "slam shut, injuring Plaintiff's wrist." *Id.* Meredith then directed plaintiff to sit down, and refused to allow her to leave the office "for a prolonged period." *Id.* According to plaintiff, Meredith "tower[ed] over" her and "aggressively interrogated" her as to why she wanted to communicate with Dennis Bartko, her supervisor for her CDG IOPM duties. *Id.* ¶ 47. Meredith ordered plaintiff not to communicate directly with Bartko, and to only communicate with Meredith and Schulz. *Id.* Plaintiff was "visibly upset" and in fear for her physical safety at the meeting. *Id.* ¶¶ 46, 47. Several days later, plaintiff was diagnosed with a sprained wrist, which required a brace. *Id.* ¶ 48.

Plaintiff alleges that on January 5, 2017, she reported the incident of December 22, 2016, to "either the NSA Police or the NSA SOCC." *Id.* ¶ 50. Plaintiff claims that she recounted the incident "truthfully and accurately," and that although she did not use the word "assault," she described in detail the events of the meeting. *Id.* "No NSA representative followed up on that report." *Id.*

Further, plaintiff alleges that on January 5, 2017, she was "denied the opportunity to use donated sick leave," in violation of Department and Office of Personnel Management ("OPM") regulations and practices. *Id.* ¶ 51. However, the Complaint provides no further detail.

On January 27, 2017, Schulz issued a Proposed Letter of Reprimand ("LOR") to plaintiff, "including specifications that alleged that Plaintiff had engaged in conduct unbecoming a federal employee regarding her reports of the December 22, 2016, incident with Meredith." *Id.* ¶ 52. Plaintiff submitted a detailed response, which she describes as arguing that the Proposed LOR was

not factually supported and that Meredith's behavior was the culmination of a series of harassing, abusive, and retaliatory actions against her.  *Id*.; *see* ECF 13-2 (plaintiff's reply to the Proposed LOR).  However, on April 24, 2017, Schulz issued an LOR.  ECF 1, ¶ 53.  Plaintiff argues that he "ignored record evidence" in doing so.  *Id*.

Schulz's LOR is attached to the Motion.  *See* ECF 13-13.[15]  It recites that, after review of the material presented by plaintiff, the preponderance of evidence does not support plaintiff's version of events, "and as such a reprimand is warranted to promote the efficiency of the service." *Id*. at 1.  According to the LOR, on December 22, 2016, plaintiff had contacted NSA Police regarding the meeting of December 22, 2016.  *Id*. at 2.  She then made a second contact on January 5, 2017, at which point she asserted that she had reported an alleged assault on December 22, 2016, but never received any follow up.  *Id*.  But, an inquiry determined that plaintiff had not actually reported any injury, physical harm, or alleged assault when she spoke with NSA Police on December 22, 2016.  As a result, the officer with whom she spoke on that date had advised her that the matter was one for human resources, and not a security matter.  *Id*.  Furthermore, according to the LOR, plaintiff's claim as to assault was "not corroborated" by the witness to the meeting of December 22, 2016 (apparently Skaggs), nor by plaintiff's initial report to NSA Police.  *Id*.  As noted, however, the Complaint, which I must take as true at this stage, alleges that the LOR ignored the evidence and was not factually supported.  ECF 1, ¶¶ 52, 53.

The LOR warned plaintiff that "future instances of this or any other actionable misconduct may form the basis for more severe disciplinary action, up to and including your removal from

---

[15] As discussed, *infra*, I may consider the LOR, which is dated April 24, 2017.  As alleged in the Complaint, the LOR indicates that it rescinded and replaced an earlier LOR issued on March 29, 2017. ECF 13-13 at 1. However, the only difference between the letters of March 29, 2017, and April 24, 2017, is that the LOR of April 24, 2017, corrects an administrative error in the grievance process instructions contained in the LOR of March 29, 2017. *Id*.

your position in the Federal service." ECF 13-13 at 2. On May 8, 2017, plaintiff filed a grievance regarding the LOR with Colonel Douglas Matty. ECF 1, ¶ 54.

On May 18, 2017, Meredith conducted plaintiff's annual performance appraisal for the period from April 1, 2016, to March 31, 2017. *Id*. ¶ 55. He assessed plaintiff as delivering an "N" performance, meaning her performance was unacceptable and did not meet standards on one or more critical elements. *Id*. Plaintiff alleges that this appraisal was "based on factual inaccuracies and misrepresentations." *Id*. Plaintiff subsequently filed a "lengthy rebuttal," and her appraisal was later overturned, with her rating upgraded to "R," indicating an acceptable performance. *Id*. ¶ 56.

Plaintiff also complains about incidents concerning her use of leave. She alleges that on June 15, 2017, Meredith unilaterally changed plaintiff's leave preferences to "leave without pay" ("LWOP"), in violation of Department regulations and practices. *Id*. ¶ 58. Plaintiff asserts that she had been previously approved for leave for July 3, 2017, and July 5, 2017. *Id*. ¶¶ 61, 62. Based on these approvals, plaintiff had given her husband's caregiver time off for those dates, and so she had to care for her husband. *Id*. ¶ 63. On June 27, 2017, after plaintiff experienced "extended and debilitating coughing," she contacted Meredith to inform him that she would be submitting a request for advanced sick leave, but received "no substantive response." *Id*. ¶ 60. The next day, plaintiff was diagnosed with pneumonia, and was off work from June 28 through July 1, 2017. *Id*. ¶ 61. Plaintiff informed Meredith of the diagnosis and expressed concern for the days she had requested off, July 3 and July 5, 2017, noting that she had already been approved for leave for those days. *Id*. However, Meredith informed plaintiff that she had only two options for these two days: report for duty or submit LWOP requests. *Id*. ¶ 62.

Ultimately, plaintiff "was charged with LWOP, rather than advanced sick leave for the period June 28 through July 1, 2017, as well as July 3 and July 5, 2017." *Id.* ¶ 64. Plaintiff asserts that Meredith, without plaintiff's authorization, "twice changed her timesheet after Plaintiff . . . recorded absences for emergency medical reasons for herself [or] for her disabled spouse." *Id.* ¶ 59. She alleges that employees not in plaintiff's "protected classifications" were not unilaterally placed in LWOP status when they "already had been pre-approved for leave and where they were eligible for advanced sick leave," and that Meredith's actions were contrary to Department and OPM regulations and practices. *Id.*

## B.

As noted, the Complaint asserts that plaintiff had a "history of engaging in protected activities." ECF 1, ¶ 23. In particular, in early 2016, "she filed an EEO Complaint," alleging unlawful discrimination and retaliation, which was assigned Case Number 9L4W16015. *Id.* In addition, in March 2016, plaintiff "complained" to an unidentified person or entity "about being required to work in a hostile work environment." *Id.* ¶ 24. Plaintiff also provided evidence in an EEO proceeding brought by an African American coworker, Dorea Morrison. *Id.*

In addition, plaintiff filed an "administrative Complaint" on November 29, 2016, alleging discrimination on the basis of her religion ("Roman Catholic"), gender, and disability, as well as unlawful retaliation. *Id.* ¶ 6. This administrative complaint was assigned Case Number 9L4W17002. *Id.* ¶ 7. And, the Complaint alleges that plaintiff "made informal EEO contact" in November 2016 "for the matters that matured" into Case Number 9L4W17002. *Id.* ¶ 42; *see also id.* ¶ 7. The NSA's Security Operations Command Center ("SOCC") was informed of plaintiff's EEO complaint on December 22, 2016. *Id.* ¶ 43. According to the Complaint, and as discussed *infra*, the Final Agency Decision ("FAD") was issued on July 17, 2020. *Id.* ¶ 7.

On December 28, 2016, following plaintiff's meeting with Meredith on December 22, 2016, at which she was allegedly injured, plaintiff was informed by an HR representative  that Cyber Command's Judge Advocate General was seeking to arrange an "immediate mediation to resolve the dispute between Plaintiff and Cyber Command."  *Id*. ¶ 49.  Between December 28, 2016 and January 27, 2017, Meredith, Schulz, and Amy Karpan met with EEO representatives as to plaintiff's EEO complaints.  *Id*.[16]

Meanwhile, plaintiff received a "Notice of Right to File Discrimination Complaint," dated January 12, 2017, in Case Number 9L4W17002.  ECF 13-4.  The notice was issued by the 11th Wing Equal Opportunity office, and informed plaintiff that because the dispute that she had submitted to the office had not been resolved to her satisfaction, she was entitled to file a formal discrimination complaint within 15 days of receipt of the notice.  *Id*. at 1.[17]  As grounds for the complaint, the notice listed hostile work environment, sex, reprisal, and associated disability.  *Id*.

Following this notice, in January 2017, plaintiff filed a "Complaint of Discrimination in the Federal Government."  ECF 13-3 (the "January 2017 EEO Complaint").  It was signed by plaintiff on January 27, 2017, with an attachment detailing plaintiff's claims that included a typed date of January 26, 2017, and a signature by plaintiff on February 2, 2017.  *Id*. at 2, 6, 11.

The January 2017 EEO Complaint appears to have been submitted to the 11th Wing Equal Opportunity office.  It is stamped as "Received by 11 WG/EO" on February 7, 2017.  *Id*. at 1.  The January 2017 EEO Complaint asserts discrimination on the basis of religion ("Roman Catholic"), sex, disability, and reprisal, on the basis of a wide variety of incidents.  *Id*. at 1, 6-11.  Some of the incidents alleged in the EEO Complaint are not included in the suit.  Those that are alleged in both

---

[16] Karpan's position is not specified in the Complaint.

[17] The 11th Wing Equal Opportunity office appears to have handled EEO issues for plaintiff's position.

the January 2017 EEO Complaint and the suit pertain to the Proposed LOR; the meeting of May 23, 2016, regarding the backdated counseling statement; the meeting of December 22, 2016, at which plaintiff's wrist was allegedly injured; Meredith's IOPM meeting on December 22, 2016; the allegations regarding the chaplain; plaintiff's budget assignment; plaintiff's exclusion from decision making and assignments; the IA certification; and Meredith berating plaintiff. *Id*. at 6-11.

The Complaint alleges that the January 2017 EEO Complaint "was subsequently amended and was fully investigated by the Department," before a decision was issued in the form of the 2020 FAD described below. ECF 1, ¶ 7. The amendment mentioned in the Complaint appears to refer to plaintiff's September 2017 EEO Complaint, also described below.[18]

On September 7, 2017, plaintiff filed another "Complaint of Discrimination in the Federal Government." ECF 13-9 (the "September 2017 EEO Complaint").[19] The document does not specify where it was filed. In the September 2017 EEO Complaint, plaintiff alleged reprisal and harassment due to her previous EEO activity, citing the LOR, performance appraisal, and issues related to "timesheets, work schedule, email and other means," an apparent reference to the LWOP

---

[18] As discussed, *infra*, the existence of a separate Final Agency Decision for the January 2017 EEO Complaint, and when it was issued, is hotly disputed by the parties.

Defendant has produced a document purporting to be the FAD as to the January 2017 EEO Complaint, dismissing the EEO complaint as untimely. *See* ECF 13-5. Plaintiff disputes the authenticity of the document. And, this document is undated. As discussed below, defendant argues it was mailed on April 24, 2017, based on evidence outside the record, which I cannot consider at this stage.

As I explain, summary judgment is premature in this case. And, at the motion to dismiss stage, most of the material as to this issue cannot be considered.

[19] The September 2017 EEO Complaint presumably followed an informal phase of dispute resolution. Unlike with the January 2017 EEO Complaint, no notice of plaintiff's right to file the September 2017 EEO Complaint has been provided to the Court.

issue. *Id.* at 1.  The September 2017 EEO Complaint was accepted in a notice dated September 27, 2017, and assigned Case Number 7M1R17002.  ECF 13-10.  The September 2017 EEO Complaint was amended in February 2018 to include allegations concerning a hostile work environment based on racial discrimination and reprisal involving the LOR, the work performance appraisal, and LWOP issues, as well as the alleged denial of donor leave on January 5, 2017.  ECF 13-11.

A Final Agency Decision as to the September 2017 EEO Complaint was issued by the Department in 2020.  ECF 13-12 (the "2020 FAD").  It was signed by Dr. Gerald D. Curry, the Director of the Air Force Review Boards Agency, on April 27, 2020.  *Id.* at 15.  The Complaint alleges that the FAD was issued on July 17, 2020, served on plaintiff and her counsel by Federal Express overnight delivery on July 17, 2020, and received by plaintiff on July 18, 2020.  ECF 1, ¶¶ 7, 8.  The 2020 FAD provided by plaintiff includes a certificate of service indicating service via Federal Express overnight delivery dated July 17, 2020.  ECF 23-2 at 2.[20]  However, the 2020 FAD provided by defendant includes a certificate of service indicating service via Federal Express overnight delivery dated July 15, 2020.  ECF 13-12 at 1.

The 2020 FAD denied plaintiff's claims as to all four incidents.  ECF 13-12 at 13.  It found that the incident as to donor leave had not occurred as plaintiff had described.  *Id.* at 4, 13.  And, it concluded that the other three incidents (LOR, appraisal, and LWOP) "did not rise to the level of a hostile work environment," but were instead "reasonable actions of the complainant's immediate supervisor and other management officials taken in the course of discharging their supervisory responsibilities."  *Id.* at 13.  Although the Complaint appears to allege that plaintiff's

---

[20] This document also indicates that the 2020 FAD sent to plaintiff's counsel was returned undelivered because counsel had moved, and that service was effected again as to plaintiff's counsel on July 22, 2020.  ECF 23-2 at 1.

January 2017 EEO Complaint was resolved in the 2020 FAD (*see* ECF 1, ¶ 7), the 2020 FAD does not contain any discussion or acknowledgment of the claims submitted by plaintiff in the January 2017 EEO Complaint, nor does it reference the Case Number assigned to the January 2017 EEO Complaint.   The 2020 FAD informed plaintiff that she had 30 days to appeal to the Equal Employment Opportunity Commission ("EEOC"), via a notice of appeal to the Office of Federal Operations ("OFO") within the EEOC, or 90 days to file suit.  ECF 13-12 at 13-14.

This lawsuit followed on October 16, 2020.  ECF 1.  According to plaintiff, it was filed within 90 days of receipt of the FAD, in accordance with 42 U.S.C. § 2000e-16(c).  *Id.* ¶ 8.

In sum, plaintiff alleges: "From the time that Meredith became her supervisor, until late 2017, Plaintiff was subjected to unrelenting harassment and abusive contact by Meredith, Schulz and Wells." *Id*. ¶ 65.  Because of the work-related stress caused by this behavior, plaintiff suffered a "transient ischemic attack" in the summer of 2017 and was diagnosed with "diabetes II." *Id*.[21] She asserts that the various adverse actions against her were motivated by her gender and associational rights under the Rehabilitation Act and Title VII, and because she engaged in protected activities.  *Id*. ¶ 68.  And, she argues that male coworkers, coworkers who "had not exercised associational rights," and coworkers who "had not engaged in protected activities" were not subjected to similar harassment and abuse by Meredith, Schulz, and Wells.  *Id.* ¶ 66.  Specifically, she identifies two such employees: Denise Dickins and Alan Hunsacker.  *Id*. ¶ 66.

Additional facts are included in the Discussion, *infra*.

---

[21] The Court may take judicial notice that a "transient ischemic attack," often called a "ministroke," "is a temporary period of symptoms similar to those of a stroke." *Transient ischemic attack (TIA)*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679 (last visited Jan. 20, 2022).

## II.  Standards of Review

### A. Summary Judgment

As noted, the Motion is styled as a "Motion to Dismiss Or In the Alternative For Summary Judgment."  ECF 13.  A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[22]

---

[22] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*.

Summary judgment ordinarily is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Putney v. Likin*, 656 Fed. App'x 632, 639 (4th Cir. 2016) (per curiam); *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'"

*Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

As noted, plaintiff has filed a Discovery Motion (ECF 19), accompanied by a Rule 56(d) declaration (ECF 19-2), indicating the discovery she seeks.  Plaintiff seeks, among other materials, documents as to the performance and disciplinary history of her asserted comparators; all documents relating to her administrative EEO complaints; communications between her managers; personnel files; and more.  ECF 19-2, ¶ 2.  She also seeks to depose Meredith, Schultz, and Wells; the two asserted comparators, Hunsacker and Dickins; and a Rule 30(b)(6) deponent.  *Id*. ¶ 2(p). Prosa contends that this discovery is relevant to her arguments as to exhaustion; her prima facie case, including comparators; and pretext.  *Id*. ¶ 4.  She also describes the discovery she seeks as not within her control, and obtainable only from defendant.  *Id*. ¶ 3.

The case of *McCray*, 741 F.3d 480, is informative.  There, the plaintiff had been an employee of the defendant for many years, and filed an EEOC Charge alleging, *inter alia*, discrimination under Title VII, based on race and gender.  *Id*. at 481-82.  In the district court, the plaintiff opposed the defendant's motion to dismiss and sought an opportunity to conduct discovery.  *Id*. at 482.  The district court denied plaintiff's motion, however, reasoning that the parties had engaged in considerable discovery during the EEOC investigation and had submitted

substantial documentary evidence in support of their positions. *Id*. Therefore, the court converted the defendant's motion to one for summary judgment. The Fourth Circuit concluded that the district court erred when it granted summary judgment to the defense without providing plaintiff an opportunity to conduct discovery. *Id*. at 481, 483-84.

Notwithstanding the significant administrative record, the Fourth Circuit made clear that discovery is appropriate when "the main issue" is "one of motive" and when "most of the key evidence lies in the control" of the party moving for summary judgment. *Id*. at 484. The plaintiff's Title VII claims required her to show "that she was fired because of discriminatory reasons," and such evidence was within the control of the defendant. *Id*. "Absent discovery," said the Court, the plaintiff lacked "adequate access to this evidence, and therefore no way to shield herself from a premature summary judgment motion." In its view, this was akin to "forc[ing] the non-moving party into a fencing match without a sword or mask." *Id*. at 483-84.

In this case, there has not yet been any discovery. And, plaintiff seeks discovery related to issues of motive and pretext, as well as comparators. ECF 19-2, ¶¶ 2-4. Furthermore, at least some of the information is within the control of defendant. *See* ECF 19-2, ¶ 3. Accordingly, summary judgment as to the merits is premature.

I reach the same conclusion as to the defense claim that suit is untimely. As the discussion, *infra*, makes clear, this issue involves numerous disputes of material fact, for which discovery is required.

### B. Motion to Dismiss

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Nadendla v. WakeMed*, ___ F.4th ___, 2022 WL 187835, at *3 (4th Cir. Jan. 21, 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir.

2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 2022 WL 187835, at *3; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck*

24

*v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed.*
*v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d
442, 450 (4th Cir. 2007).

And, "before treating the contents of an attached or incorporated document as true, the
district court should consider the nature of the document and why the plaintiff attached it." *Goines*,
822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon
which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the
contents of the document, crediting the document over conflicting allegations in the complaint is
proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes
other than the truthfulness of the document, it is inappropriate to treat the contents of that document
as true." *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court
may consider documents beyond the complaint without converting the motion to dismiss to one
for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir.
2015). In particular, a court may "consider a document submitted by the movant that [is] not
attached to or expressly incorporated in a complaint, so long as the document was integral to the
complaint and there is no dispute about the document's authenticity." *Goines,* 822 F.3d at 166
(citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of*
*Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017);
*Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be
"integral," a document must be one "that by its 'very existence, *and not the mere information it*
*contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal*
*Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation

omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

"In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Campbell v. Mayorkas*, 3:20-cv-697-MOC, 2021 WL 2210895, at *1 n.3 (W.D.N.C. July 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)). Under these principles, I may consider the following documents, because they are referenced in the Complaint or otherwise integral to plaintiff's claims, their authenticity is not disputed, and defendant does not take issue with their consideration: plaintiff's January 2017 EEO Complaint, signed January 27, 2017 (ECF 13-3); the notice of a right to file a complaint sent to plaintiff and dated January 12, 2017 (ECF 13-4); the EEO counselor report for the January 2017 EEO Complaint, dated April 5, 2017 (ECF 13-6); the EEO counselor report for the September 2017 EEO Complaint, dated September 18, 2017 (ECF 13-8); plaintiff's September 2017 EEO Complaint, signed September 7, 2017 (ECF 13-9); the notice of accepted EEO complaint sent to plaintiff, dated September 27, 2017 (ECF 13-10); an EEO memorandum regarding plaintiff's

request to amend her September 2017 EEO Complaint, dated February 20, 2018 (ECF 13-11); the 2020 FAD (ECF 13-12); the notice of decision of reprimand dated April 24, 2017 (ECF 13-13); the notice of rights and responsibilities signed by plaintiff on June 27, 2017 (ECF 22-1); plaintiff's response to the proposed letter of reprimand dated February 2, 2017 (ECF 22-2); and the 2020 FAD, as received by plaintiff (ECF 23-2).  However, I do not necessarily take the contents of these documents as true.

With the Motion, defendant submitted a document it describes as the FAD with respect to plaintiff's January 2017 EEO Complaint.  *See* ECF 13-5 (the "Disputed FAD").  Ordinarily, a court could consider such a document at the Rule 12(b)(6) stage.  However, a court should not consider a document offered by the movant on a motion to dismiss if there is any "dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also, e.g.*, *Johnson v. Portfolio Recovery Associates, LLC*, 682 F. Supp. 2d 560, 570 (E.D. Va. 2009) (considering EEOC charge attached by defendant to motion to dismiss when plaintiff did not "dispute the authenticity of the EEOC charge").  Plaintiff disputes the authenticity of the Disputed FAD, which she asserts she did not receive when it was supposedly issued, referring to it as "a document purporting to be a FAD in Case No. 9L4W17002."  ECF 18 at 18.  Therefore, I may not consider the Disputed FAD at this juncture.

### III.  Discussion

### A.  Timeliness and Exhaustion

### 1. Legal Principles

Plaintiff brings suit under both Title VII and the Rehabilitation Act.  Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2.

Title VII's prohibitions apply to private sector employees as well as federal employees. *Nielsen v. Hagel*, 666 Fed. App'x 225, 227 (4th Cir. 2016) (citing 42 U.S.C. § 2000e-16(a)).[23] Before filing suit under Title VII, however, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees), *superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray*, 662 Fed. App'x at 224. Notably, "[t]he administrative remedies available for federal employees are significantly broader" than those available to employees in the private sector. *Laber v. Harvey*, 438 F.3d 404, 416 (4th Cir. 2006) (en banc); *see* 42 U.S.C. § 2000e-16(c) (setting forth the conditions under which a federal employee may initiate a civil suit under Title VII).

For its part, the Rehabilitation Act prohibits federal agencies from discriminating against qualified employees based on a disability and authorizes civil actions to redress discrimination. *Figueroa v. Geithner*, 711 F. Supp. 2d 562, 569 (D. Md. 2010). The Fourth Circuit has said: "Rehabilitation Act claims against the federal government must comply with the same administrative procedures that govern federal employee Title VII claims." *Wilkinson v. Rumsfeld*, 100 Fed. App'x 155, 157 (4th Cir. 2004) (citing *Doe v. Garrett*, 903 F.2d 1455, 1460-61 (11th Cir.

---

[23] Title VII initially did not protect federal employees. *See* 42 U.S.C. § 2000e(b) (excluding the United States from the definition of "employer"). In 1972, however, Congress amended Title VII to provide that a federal employee who has exhausted her administrative remedies "may file a civil action as provided in section 2000e-5 of this title" against the "head of the department, agency, or unit, as appropriate." 42 U.S.C. § 2000e-16(c); *see Bullock v. Napolitano*, 666 F.3d 281, 283-84 (4th Cir. 2012), *cert. denied*, 568 U.S. 882 (2012).

1990)).  Therefore, the principles and requirements described below with reference to Title VII apply to the Rehabilitation Act as well.[24]

The Supreme Court has said that a plaintiff's failure to exhaust administrative remedies does not divest the court of jurisdiction.  *Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846 (2019).  Rather, exhaustion is a "claim-processing rule," and it is "'mandatory' in the sense that a court must enforce the rule if a party 'properly raises it.'"  *Id*. (cleaned up) (quoting *Eberhart v. United States*, 546 U.S. 12, 19, (2005) (per curiam)).   Although a defendant may waive arguments related to administrative exhaustion, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6).   *See Kenion v. Skanska USA Bldg., Inc*., RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Davis*).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).  Rather, it advances the "twin objectives" of "protecting agency authority in the administrative process and promoting efficiency in the resolution of claims."  *Stewart*, 912 F.3d at 699 (internal quotation marks, alterations, and citation omitted).

If a federal employee fails to exhaust her administrative remedies, she is generally barred from filing suit. *See, e.g., Miles v. Dell*, 429 F.3d 480, 491 (4th Cir. 2005); *Bryant v. Bell Atl. Md., Inc*., 288 F.3d 124, 132 (4th Cir. 2002); *Frank v. England*, 313 F. Supp. 532, 536 (D. Md. 2004) ("Before an employee has standing to pursue a claim against a federal employer under Title VII,

---

[24] The Rehabilitation Act does not require administrative exhaustion by non-federal employees. *See Bowman-Cook v. Wash. Metro. Area Transit Auth*., DKC-14-1877, 2017 WL 3592450, at *5 n.4 (D. Md. Aug. 21, 2017) ("Non-federal employees are not required to exhaust any administrative remedies under the Rehabilitation Act . . . ."); *Harris v. O'Malley*, WDQ-13-2579, 2015 WL 996557, at *5 (D. Md. Mar. 4, 2015) ("'[C]ourts have uniformly held that non-federal employees need not exhaust administrative remedies before bringing a private action under Section 504'" of the Rehabilitation Act) (citation omitted).

he must first exhaust the available administrative remedies by proceeding before the agency charged with the discrimination.").

To start, the employee "must initiate contact with [an EEO] Counselor [in the employee's federal agency] prior to filing [an agency EEO] complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a); *see also Nielsen*, 666 Fed. App'x at 227.  And, the employee "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see also Nielsen*, 666 Fed. App'x at 227; *Verrier v. Sebelius*, CCB-09-402, 2010 WL 1222740, at *8 (D. Md. Mar. 23, 2010).  "Failure   to   comply [with the 45-day requirement] mandates dismissal, unless the plaintiff provides evidence that (1) he was unaware of the time limits for contacting an EEO counselor, or (2) the government engaged in affirmative misconduct in relation to the plaintiff seeking counseling."  *Verrier*, 2010 WL 1222740, at *8 (internal citations omitted).

The EEO Counselor must "conduct an initial counseling session, during which the counselor must inform the aggrieved party in writing of his rights and responsibilities, and offer the employee the option of pursuing alternative dispute resolution (ADR)."  *Nielsen*, 666 Fed. App'x at 227 (citing 29 C.F.R. §§ 1614.105(b)(1), (2)).  Counseling may lead to the withdrawal of the claim or a settlement agreement between the employee and the employer.  *See* 29 C.F.R. § 1614.504(a); *Campbell v. Geren*, 353 Fed. App'x 879, 882 (4th Cir. 2009).  If the employee chooses to pursue ADR, the EEO Counselor must conduct a "final interview" within 90 days of the initial interview.  29 C.F.R. §§ 1614.105(d), (f). At the end of the 90-day period, if the matter is not resolved, "the counselor must issue a written notice of right to file a formal complaint within the agency." *Nielson*, 666 Fed. App'x at 227 (citing 29 C.F.R. § 1614.105(d)-(f)). Thereafter, the

aggrieved party must file a formal complaint with the agency within 15 days of receipt of notice from the agency.  *See* 29 C.F.R. §§ 1614.105(d), 1614.106(b).

Once the agency takes "final action" with regard to the formal complaint, the aggrieved party may appeal the decision to the EEOC or, within 90 days, file a civil action in court.  *See* 42 U.S.C. § 2000e-16; 29 C.F.R. §§ 1614.110, 1614.401, 1614.407(a); *see also Nielsen*, 666 Fed. App'x at 228. If an employee appeals to the EEOC, the Office of Federal Operations ("OFO"), within the EEOC, "reviews the record, supplements it if necessary, and then issues a written decision." *Scott v. Johanns*, 409 F.3d 466, 468 (D.C. Cir. 2005) (citing 29 C.F.R. § 1614.404-05). Although the regulations sometimes refer to "the Commission," the OFO acts "on behalf of" the EEOC in the federal employment context.  *See* 29 C.F.R. § 1614.405(a), (b).  A decision by the OFO is considered to be final, "triggering the right to sue" in court.  *Scott*, 409 F.3d at 468 (citing 29 C.F.R. § 1614.405(b)).

Of relevance here, the employee must initiate the civil lawsuit "[w]ithin 90 days of receipt of the Commission's final decision [meaning the final decision of the OFO, on behalf of the EEOC] on an appeal." 29 C.F.R. §§ 1614.407(a), (c).  In the absence of evidence of the date of receipt, a right-to-sue letter is presumed to have been received by the plaintiff three days after it was issued and mailed, pursuant to Fed. R. Civ. P. 6(d).[25]  *See Baldwin Cty. Welcome Ctr.*, 466 U.S. at 148 n. 1 (applying presumption that notice is received three days after issuance, and citing former Fed. R. Civ. P. 6(e)); *see also Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 526 (2d Cir.1996) ("[N]ormally it may be assumed, in the absence of challenge, that a notice provided by a

---

[25] Given the postal service's recent issues with timely mail delivery, perhaps it is time to revise the 3-day rule. *See, e.g.*, Mary Pflum, *More mail delays coming as postal workers worry about future of post office*, NBC NEWS (Oct. 1, 2021), https://www.nbcnews.com/news/us-news/more-mail-delays-coming-postal-workers-worry-about-future-post-n1280505.

government agency has been mailed on the date shown on the notice.") (citing *Baldwin Cty. Welcome Ctr.*, 466 U.S. at 148 & n.1).  If the agency fails to issue a final decision within 180 days of receipt of the formal complaint, or if the EEOC fails to rule within 180 days of the filing, the aggrieved party may file suit.  29 C.F.R. §§ 1614.407(b), (d).

The Fourth Circuit does not adhere to an "actual notice" rule.  Rather, a plaintiff is deemed to have received notice when the right-to-sue letter is received by a member of the plaintiff's household of suitable age and discretion, *see Harvey v. City of New Bern Police Dept.*, 813 F.2d 652, 654 (4th Cir.1987), or "when the Postal Service delivers notice to a plaintiff that the right-to-sue letter is available for pickup," even if the plaintiff does not actually take possession of the letter until a later date.  *Watts–Means v. Prince George's Family Crisis Ctr.*, 7 F.3d 40, 42 (4th Cir.1993).

To be sure, the presumptions that a right-to-sue letter is mailed on its date of issuance and is received three days after mailing "are convenient and reasonable in the absence of evidence to the contrary," but they are not "irrebuttable."  *Sherlock*, 84 F.3d at 526. "If a claimant presents sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach her by mail, the initial presumption is not dispositive."  *Id.*; *see, e.g., Hilton v. Bedford Paving, LLC*, 769 F. Supp. 2d 92, 99 (W.D.N.Y. 2010) (finding that presumption of receipt three days after issuance was rebutted where plaintiffs "submitted sworn affidavits indicating that they never received the right-to-sue letter" and defendants did not "submit[ ] any contrary evidence, and . . . rel[ied] solely on the . . . presumption that Plaintiff received the letter three days after it was dated"); *Edwards v. Galveston–Texas City Pilots*, 203 F. Supp. 2d 759, 775 n. 9 (S.D. Tex. 2002) (concluding that presumption of receipt three days after issuance not rebutted where plaintiff

"testifie[d] that he [did] not remember when he received the letter"); *Griffin v. Acacia Life Ins. Co.*, 151 F. Supp. 2d  78, 80-81 (D.D.C.2001) (finding presumption of receipt three days after issuance not rebutted where plaintiff did not remember date of receipt but offered sworn declaration of her attorney that attorney's calendar contained notation of due date for filing complaint; stating that attorney's records supported inference of date that attorney believed notice had been received, but could not "establish[ ] when plaintiff actually received the letter") (emphasis in original).

The administrative exhaustion process also has substantive effect.  Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims named in the administrative charge. *See* 42 U.S.C. § 2000e–5(f)(1); *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012); *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998); *Evans*, 80 F.3d at 963.  Thus, "when the claims in [the] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred."  *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508).  To illustrate, the Fourth Circuit has stated that a "'claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.'"  *Nnadozie v. Genesis Healthcare Corp.*, 730 Fed. App'x 151, 161 (4th Cir. 2018) (quoting *Chacko*, 429 F.3d at 509) (ellipsis in *Nnadozie*).

That said, the EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination[.]'"  *Miles*, 429 F.3d at 491 (citation omitted); *see Chacko*, 429 F.3d at 512.  And, because "EEOC charges often are not completed by lawyers," the Fourth Circuit has instructed courts to "construe them liberally."

*Chacko*, 429 F.3d at 509; *see Sydnor*, 681 F.3d at 594 ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs."). Thus, a federal court may hear a claim that was not presented to the EEOC so long as it is "'reasonably related'" to the plaintiff's EEOC charge "'and can be expected to follow from a reasonable administrative investigation . . . .'" *Sydnor*, 681 F.3d at 594 (quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000)); *see also Stewart*, 912 F.3d at 705; *Miles*, 429 F.3d at 491 (noting that EEOC charge "'does not strictly limit a ... suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination'") (quoting *Bryant*, 288 F.3d at 132).

## 2. Analysis

Defendant makes a number of arguments as to timeliness and exhaustion. For the most part, these arguments implicate disputed questions of fact as to whether, and when, plaintiff received final agency decisions for the January 2017 EEO Complaint and the September 2017 EEO Complaint. Thus, the procedural posture largely resolves defendant's main arguments.

As noted, in the context of a motion to dismiss under Rule 12(b)(6), the court may consider an affirmative defense, such as exhaustion or timeliness, only in the "relatively rare circumstances where facts sufficient to rule on [the] affirmative defense are alleged in the complaint." *Goodman*, 494 F.3d at 464. "This principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint.*'" *Id.* (quoting *Forst*, 4 F.3d at 250) (emphasis in *Goodman*).

Defendant asserts that a FAD for plaintiff's January 2017 EEO Complaint was sent to plaintiff in April of 2017, and that plaintiff received it. ECF 13-1 at 4; ECF 22 at 2-3, 6. I previously referred to this FAD as the "Disputed FAD." With the Motion, defendant submitted a

document it describes as the Disputed FAD.  *See* ECF 13-5.  Notably, it contains no dates that indicate when it was issued or mailed.  *See* ECF 13-5.  This is in contrast to the 2020 FAD, which contains dates at two different places, one next to the signature of the issuing official and another on the certificate of service.  *See* ECF 13-2 at 1, 15.

To support the claim that the Disputed FAD was mailed in April 2017, defendant relies on a photograph of the "11th Wing EO Office Certified Mail Log."  ECF 13-7.  It indicates that on April 27, 2017, a document labelled as "Dismissal Letter" was mailed to plaintiff and her counsel.  *See* ECF 13-7.  But, this document plainly cannot be considered at the Rule 12(b)(6) stage.

The Complaint makes no mention of the Disputed FAD.  Moreover, plaintiff vigorously disputes the contentions, at least as to any point in time prior to July 2020.  *See* ECF 13-1 at 11-12; ECF 18 at 21-25; ECF 18-2 (Prosa Decl.), ¶¶ 53-57; ECF 22 at 5-9.; ECF 23 at 4-5.  In Prosa's view, discovery is needed to determine whether the Disputed FAD was ever mailed.  *See* ECF 18 at 18-19; ECF 23 at 4-5.

As to the 2020 FAD, plaintiff alleges in the Complaint that she received the decision on July 18, 2020.  ECF 1, ¶ 8.  And, suit was filed on October 16, 2020.  ECF 1.  Along with her reply regarding the Discovery Motion, plaintiff has also submitted a copy of the 2020 FAD.  I may consider that exhibit, because it is referenced in the Complaint and integral to it.  The 2020 FAD includes a certificate of service indicating that it was served via FedEx overnight delivery on July 17, 2020, meaning that plaintiff would have received the document on July 18, 2020.  ECF 23-2 at 2.  In contrast, the 2020 FAD provided by defendant includes a certificate of service indicating a FedEx service date of July 15, 2020. ECF 13-12 at 1. The discrepancy between these two certificates has not been explained by the parties.

Plaintiff's Declaration, submitted with her Opposition, appears to aver that the Disputed FAD was finally received by plaintiff on July 15, 2020, and that the 2020 FAD was served on July 15, 2020, and received on July 17, 2020. ECF 18-2, ¶¶ 55, 57.  It is unclear why in July 2020, plaintiff would have received a FAD that the government contends was mailed in April 2017.  But, no documentation as to receipt of the Disputed FAD was submitted.

In any event, these dates (July 15, 2020, and July 17, 2020) would place the Complaint outside the 90-day window by which suit must be filed as to *both* FADs.  However, in her reply regarding her Discovery Motion, plaintiff states that the dates set forth in her Declaration were "inadvertent" error. ECF 23 at 2-4; ECF 23-1.  She asserts that she received the 2020 FAD on July 18, 2020, but is less clear as to whether she asserts the same regarding the Disputed FAD.

In its Reply, defendant seizes on plaintiff's Declaration to argue that the entire suit is untimely, because plaintiff received both FADs more than 90 days before she filed the Complaint. ECF 22 at 4-5.[26]  Furthermore, in the Motion, defendant notes that the Complaint's claims as to gender and disability discrimination, hostile work environment under the Rehabilitation Act, and retaliation under the Rehabilitation Act (Counts I, IV, V, and VII), as well as the factual allegations as to events between January and December 2016, were raised in the January 2017 EEO Complaint.  ECF 13-1 at 4, 12.  Because defendant asserts that the Disputed FAD (for the January 2017 EEO Complaint) was received by plaintiff in April 2017, and plaintiff failed to file suit within 90 days thereafter, defendant argues that any suit based on these events is untimely.  *Id*. at 12.

---

[26] "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc*., 451 F. Supp. 2d 731, 734 (D. Md. 2006).  Here, the defense argument in its Reply was prompted by an exhibit attached to plaintiff's Opposition, which led plaintiff to respond in her reply to the Discovery Motion.

However, these arguments do not provide a basis to dismiss the Complaint at this stage, whether in its entirety or with respect to the events raised in the January 2017 Complaint. The argument that the entire suit is untimely relies on assertions made by plaintiff in a Declaration attached to the Opposition. And, the argument that the events in the January 2017 Complaint are untimely relies on the single mail log photograph indicating that a "Dismissal Letter" was sent to plaintiff and her then-counsel on that date. *See* ECF 13-7. But, these materials plainly may not be considered with respect to a Rule 12(b)(6) motion.

At the Rule 12(b)(6) stage, the Complaint is the critical document. And, in the Complaint, plaintiff alleges that she received the 2020 FAD on July 18, 2020. ECF 1, ¶ 8. Furthermore, the 2020 FAD provided by plaintiff includes a certificate of service indicating that the FAD was served via FedEx overnight delivery on July 17, 2020, meaning that plaintiff would have received the document on July 18, 2020. ECF 23-2 at 2. And, no documents that I may consider indicate any date of mailing, service, or receipt for the Disputed FAD. At this juncture, I must accept the date of July 18, 2020. On that basis, suit was timely filed on October 16, 2020, *i.e.*, within 90 days of receipt of the 2020 FAD. ECF 1, ¶ 8.

As to the Disputed FAD, which pertains to the January 2017 EEO Complaint, the suit does not allege the date of receipt, or even that the Disputed FAD exists. To the contrary, the suit asserts that, in essence, plaintiff submitted the January 2017 EEO Complaint but did not receive a decision. Moreover, plaintiff submitted the September 2017 EEO Complaint, which she regarded as a continuation of her first case, and it culminated in the 2020 FAD. ECF 1, ¶ 7, 8.

Ordinarily, the FAD itself could be considered at the motion to dismiss stage, and the date on the FAD could help to resolve the issue. But, as noted, the document itself lacks any date. *See*

ECF 13-5.  Moreover, as mentioned, plaintiff contests the authenticity of the Disputed FAD, which she refers to as an "undated purported FAD."  ECF 18 at 21.

Because the parties dispute the date on which the Disputed FAD was issued (not to mention its existence), much of the case law cited by defendant is inapposite.  *See* ECF 22 at 6-8.  As noted, there is a rebuttable presumption that a letter is received within three days after it is mailed.  *See, e.g.*, *Baldwin Cty. Welcome Ctr.*, 466 U.S. at 148 n.1; *Sherlock*, 84 F.3d at 526; *Watts-Means*, 7 F.3d at 42; *Harvey*, 813 F.2d at 654.  But, this principle depends on establishing a date on which any purported letter was mailed in the first place.  *See Sherlock*, 84 F.3d at 526 ("[N]ormally it may be assumed, in the absence of challenge, that a notice provided by a government agency has been mailed *on the date shown on the notice*.") (emphasis added).  Indeed, in *Sherlock*, the district court granted the defendant's motion to dismiss on the ground that the plaintiff filed suit 96 days after she was presumed to have received her right-to-sue letter under the three-day rule.  *Id*. at 525. But, the Second Circuit noted "clear ground" in the record to question the dates on which the letter was mailed by the EEOC and received by the plaintiff.  *Id*. at 526.  Because this uncertainty created an "issue of fact" as to the date of mailing and receipt, the Second Circuit reversed the district court.  *Id*.

Here, the date (if any) on which the Disputed FAD was mailed to, or received by, plaintiff is hotly contested.  Accordingly, dismissal is not warranted on the ground that the suit, or portions of the suit, are untimely.

Defendant makes a similar argument as to exhaustion.  Because the claims and factual allegations raised in the January 2017 EEO Complaint were not raised in the September 2017 EEO Complaint, nor discussed in the 2020 FAD, defendant contends that they were not adequately exhausted.  ECF 13-1 at 9-11.  But, this contention presupposes that the suit was untimely filed as

to the Disputed FAD.  And, as I have discussed, the Court cannot reach this conclusion at the motion to dismiss stage.

Defendant agrees that the various claims at issue here were raised either in plaintiff's January 2017 EEO Complaint or her September 2017 EEO Complaint.  The suit appears to allege that the proceedings related to the January 2017 EEO Complaint essentially transformed into those related to the September 2017 EEO Complaint.  ECF 1, ¶ 7.  As defendant points out (ECF 22 at 8), there were signs during the administrative process that should perhaps have indicated to plaintiff that this was not what was occurring.  But, regardless, whether or when plaintiff received the Disputed FAD, and whether this lawsuit is timely based on the January 2017 EEO Complaint, is a contested factual question.  If the Department failed to issue a final decision within 180 days of receipt of the January 2017 EEO Complaint, plaintiff had the right to sue based on the claims in that complaint.  *See* 29 C.F.R. § 1614.407(b) (not specifying any subsequent deadline).  And, if the Department issued a final decision but suit was timely, then the issues raised in the January 2017 EEO Complaint may likewise be raised in this suit.

Discovery may bear out defendant's contentions as to timeliness and exhaustion.  But, at the motion to dismiss stage, these arguments do not support dismissing claims from the Complaint.  Because I reject defendant's argument on this basis, there is no need to consider plaintiff's arguments as to equitable tolling, or that the claims and events in the January 2017 EEO Complaint are like or related to those in the September 2017 EEO Complaint.

### 3. Donor Leave

Plaintiff alleges that she was denied the opportunity to use donated sick leave on January 5, 2017.  ECF 1, ¶ 45.  Defendant argues, however, that plaintiff did not make contact with an EEO counselor within 45 days of her alleged denial of donor leave.  ECF 13-1 at 12-13.  Because this

argument does not involve disputed facts, and is somewhat distinct from defendant's arguments as to timeliness and exhaustion, I consider it separately.

As noted, an employee "must initiate contact with [an EEO] Counselor within 45 days of the date of [a] matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see also Nielsen*, 666 Fed. App'x at 227. Defendant points out that plaintiff did not contact a counselor until June 5, 2017, several months after the 45-day deadline. *See* ECF 13-10 at 1. Therefore, defendant argues that any allegations based on this issue must be dismissed, because plaintiff failed to make contact with an EEO counselor within 45 days of January 5, 2017. ECF 13-2 at 12-13.

Plaintiff does not dispute this timeline. Instead, she argues that the donated sick leave issue is related to and like the allegations in her timely-filed September 2017 EEOC Complaint, as part of a "continuing unlawful discriminatory, retaliatory and harassing scheme implemented by Meredith, Schulz and Wells," and thus may still be considered by the Court. ECF 18 at 25-26. Defendant does not address this issue in its Reply.

The September 2017 EEO Complaint did not mention the donor leave issue. *See* ECF 13-9. But, in February 2018, plaintiff amended her complaint to add, among other things, the donor leave issue. *See* ECF 13-11 at 2.

In 29 C.F.R. § 1614.106(d), it states: "A complainant may amend a complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint." Some courts have held that a "like or related" claim added via amendment made under § 1614.106(d) is not subject to the 45-day counseling requirement. But, this has been in the context of events that occurred after the initial complaint, or when the complainant did not learn about the matter until after the initial complaint. *See, e.g.*, *Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239, 1246 n.4 (11th Cir. 2012) (complainant did not learn about events until after initial

complaint); *Weber v. Battista*, 494 F.3d 179, 183 (D.C. Cir. 2007) (non-selection after initial complaint); *Printemps-Herget v. Brennan*, No. 3:18-cv-476-MO, 2019 WL 4580484, at *3 (D. Or. Sept. 19, 2019) (termination after initial complaint); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 215-16 (D.D.C. 2013) (non-promotion after initial complaint); *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 76 (D.D.C. 2006) (constructive discharge claim after initial complaint).   Here, the alleged donor leave denial occurred on January 5, 2017.   ECF 1, ¶ 51.   And, plaintiff has provided no explanation as to why she waited as long as she did to raise the issue.

However, as noted, "plaintiffs may bring Title VII claims for the first time before a district court, so long as they are like or reasonably related to charges in the original administrative complaint, and if they reasonably could have developed from the agency's investigation of the original complaint."   *Stewart*, 912 F.3d at 706.   At this stage, the donor leave issue appears adequately like or related to the incidents asserted in the September 2017 Complaint.

The September 2017 EEO Complaint, as originally presented, *i.e.,* before it was amended in February 2018, alleged retaliation and harassment through, *inter alia*, plaintiff's "timesheets, work schedule, email and other means."   ECF 13-9 at 1.   This issue appears to have been interpreted to include the LWOP issue.   *See* ECF 13-11 at 1.   The allegation of being denied the opportunity to use donated sick leave is "reasonably related" to issues of scheduling and leave, and could "'be expected to follow from a reasonable administrative investigation.'"   *Sydnor*, 681 F.3d at 594 (quoting *First Union Nat. Bank*, 202 F.3d at 247).   Indeed, the amendment was accepted by the Department as "like or related" to the original claims.   ECF 13-11 at 1.

It is also notable that the Department considered the donor leave issue on the merits in the 2020 FAD, without mentioning any issue as to exhaustion.   *See* ECF 13-12 at 4.   An agency does not waive a timeliness defense simply because it accepts and investigates a complaint.   *See, e.g.*,

41

*Blount v. Shalala*, 199 F.3d 1326, 1999 WL 978892, at *1 (4th Cir. 1999) (per curiam); *Belgrave v. Pena*, 254 F.3d 384, 387 (2d Cir. 2001). But, the D.C. Circuit has remarked: "Although agencies do not waive a defense of untimely exhaustion merely by accepting and investigating a discrimination complaint, we have suggested that if they not only accept and investigate a complaint, but also decide it on the merits—all without mentioning timeliness—their failure to raise the issue in the administrative process may lead to waiver of the defense when the complainant files suit." *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997); *see also Ester v. Principi*, 250 F.3d 1068, 1071-72 (7th Cir. 2001) ("[W]hen an agency decides the merits of a complaint, without addressing the question of timeliness, it has waived a timeliness defense in a subsequent lawsuit."). Conversely, the Fifth Circuit has held that an agency only waives a timeliness defense in subsequent litigation if it makes a specific finding as to timeliness at the administrative level, as opposed to simply not mentioning timeliness. *Rowe v. Sullivan*, 967 F.2d 186, 191 (5th Cir. 1992).

The 2020 FAD simply does not address the issue. And, to my knowledge, the Fourth Circuit has not ruled on whether an agency can waive a timeliness issue by not mentioning the issue at the administrative level. Thus, I conclude that defendant's arguments as to exhaustion and timeliness do not warrant dismissal of the suit.

## B. The Merits

### 1. The Contentions

Plaintiff has lodged seven claims: discrimination on the basis of sex, in violation of Title VII (Count I); discrimination on the basis of plaintiff's association with African Americans, in violation of Title VII (Count II); unlawful retaliation, in violation of Title VII (Count III); discrimination on the basis of plaintiff's association with a person with a disability, in violation of

the Rehabilitation Act (Count IV); unlawful retaliation, in violation of the Rehabilitation Act (Count V); hostile work environment, in violation of Title VII, based on gender, race, and retaliation (Count VI); and hostile work environment, in violation of the Rehabilitation Act, based on disability and retaliation (Count VII).

Defendant argues that, as to Count II, plaintiff has not adequately alleged a connection between her racial affiliation and her claim of associational discrimination on the basis of race. Defendant makes a similar assertion as to Count VI, to the extent the claim is based on race. ECF 13-2 at 16-20. In a footnote, defendant also asserts a failure adequately to allege causation as to plaintiff's gender-related hostile work environment claim in Count VI. *Id*. at 17 n.5. As to plaintiff's retaliation claims in Count III and Count V, defendant argues that she has not alleged any evidence of knowledge or causal connection. *Id*. at 14-16. Moreover, defendant argues that plaintiff has not met the "severe or pervasive" standard required for hostile work environment claims (Count VI and Count VII). *Id*. at 21-23. And, defendant argues that any claims based on plaintiff's alleged negative performance appraisal must be dismissed because the appraisal was changed, and thus did not result in a negative appraisal. *Id*. at 20-21.

Beyond its timeliness and exhaustion arguments, discussed above, defendant does not appear to make direct arguments with respect to plaintiff's claims for gender discrimination (Count I) or disability discrimination (Count IV). But, in its Reply, defendant indicates that the logic of its causation argument as to race would apply to these claims as well. *See* ECF 22 at 13 n.3.

### 2. Proof Scheme

The proof scheme first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is helpful in analyzing the viability of plaintiff's claims under Title VII and the Rehabilitation Act.

In general, at trial a plaintiff "may establish a discrimination claim . . . through two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 Fed. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Nassar*, 570 U.S. 338). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997); *see Thomas*, 715 Fed. App'x at 302. The plaintiff's second avenue is to follow the burden-shifting approach articulated in *McDonnell Douglas*. *See, e.g.*, *Young v. United Parcel Serv., Inc.*, 569 U.S. 206, 228-29 (2015) (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonell Douglas* framework); *see also Sempowich v. Tactile Systems Technology, Inc.*, 19 F.4th 643, 649 (4th Cir. 2021) ("To survive a motion for summary judgment on a Title VII disparate treatment claim, a plaintiff must either proceed under the mixed-motive framework or the *McDonnell Douglas* burden-shifting framework.").

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production" at trial. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). It is intended to be flexible, "not onerous," and is designed to uncover "circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). However, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion*

*Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, it "is 'not intended to be an inflexible rule.'" *Young*, 575 U.S. at 228 (citation omitted).  And, even under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

Reference to these methodologies of proof often serves to inform a court's evaluation of a motion for summary judgment.  *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that "a Title VII plaintiff may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnell Douglas Corp*"); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 Fed. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*").  However, in resolving a Rule 12(b)(6) motion, the question for the court is whether the plaintiff has stated a plausible claim for relief.  At the motion to dismiss stage, a plaintiff need not establish a prima facie case of discrimination. Nonetheless, reference to the elements of a prima facie claim helps to gauge the adequacy of the factual allegations in terms of plausibility.

In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."  Further, the Court stated that it had "never indicated that the requirements for

establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511.  Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, 557 U.S. 1138 (2016).

However, as the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544.  *See Littlejohn v. Cty. of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309.  On the other hand, in *Twombly* the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of Twombly is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684.

In *Woods*, 855 F.3d at 648, the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]"  *See also Swaso v. Onslow Cty. Bd. of Educ.*, 698 Fed. App'x 745, 747-48 (4th Cir. 2017) ("While a plaintiff need not plead a prima facie case to survive a motion to dismiss, a Title VII complaint is still subject to dismissal if it does not meet the ordinary pleadings standard under *Twombly* and *Iqbal*." (internal citations omitted)); *McCleary*, 780 F.3d at 584; *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).

In sum, at the motion to dismiss stage the question "is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII [or the Rehabilitation Act] 'above a speculative level.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (quoting *Coleman*, 626 F.3d at 190).

### 3. Title VII Principles

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. *See Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021). This proscription is "often referred to as the 'disparate treatment' (or 'intentional discrimination') provision . . . ." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015). The Supreme Court has referred to discrimination based on one of the five characteristics specified above as "status-based discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013). Moreover, "terms, conditions or privileges of employment" is "an expansive concept." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).

Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3. In 42 U.S.C. § 2000e-3, it states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *See, e.g.*, *Sempowich*, 19 F.4th at 654; *Roberts*, 998 F.3d at 122; *Kitlinski v. United States Dep't of Justice*, 994 F.3d 224, 232 (4th Cir. 2021); *Evans v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666

47

(4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F.3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

In the employment context, courts analyze claims of racial discrimination under Title VII consistent with claims under 42 U.S.C. § 1981. *Sillah v. Burwell*, 244 F. Supp. 3d 499, 511 (D. Md. 2017).  Of relevance here, "where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's own race," which is actionable under Title VII.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008); *see Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 258 (4th Cir. 2001) ("It is well-settled that a claim of discrimination based on an interracial relationship or association is cognizable under [42 U.S.C. §] 1981.") (quoting *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996)); *Collin v. Rectors & Visitors of Univ. of Va.*, 163 F.3d 598, 598 (4th Cir. 1998) (per curiam) ("[I]t is generally accepted that the spouses of members of protected parties may be able to make out a prima facie case of discriminatory discharge."); *Fiedler v. Marumsco Christian School*, 631 F.2d 1144, 1150 (4th Cir. 1980) ("And it is settled that the nature of the discrimination in this case-taking adverse action against a white person because of his association with blacks-falls under [42 U.S.C. §] 1981"); *Autrey v. Maryland*, GLR-14-3064, 2016 WL 362502, at *3 (D. Md. Jan. 29, 2016) (discussing cases).

To state a prima facie claim of discrimination under Title VII, the plaintiff generally must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'"  *Goode v. Cent. Va. Legal Aid Soc., Inc.*, 807 F.3d 619, 626 (4th Cir. 2015)

(quoting *Coleman*, 626 F.3d at 190); *see Sempowich*, 19 F.4th at 649-50; *Matias v. Elon Univ.*, 780 Fed. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 Fed. App'x 198, 203 (4th Cir. 2018).

As to the satisfactory job performance factor, a plaintiff need not "show that he was a perfect or model employee. Rather, a plaintiff must only show that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Haynes*, 922 F.3d at 225; *see Sempowich*, 19 F.4th at 650.

"[T]he existence of some adverse employment action is required" for a plaintiff to prevail on a Title VII discrimination claim. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also Laird v. Fairfax Cty, Va.*, 978 F.3d 887, 893 (4th Cir. 2020) ("For a discrimination claim, the plaintiff must show that her employer took an action that adversely 'affect[ed] employment or alter[ed] the conditions of the workplace.'" (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) ("*Burlington Northern*"))). And, the adverse action must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Sempowich*, 19 F.4th at 650 (citing *Bing*, 959 F.3d at 616 n.8; *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)); *see also Swaso*, 698 Fed. App'x at 747-48 (requiring that "the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'") (quoting *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)).

Notably, in *Swaso*, a racial discrimination case, the Court said, 698 Fed. App'x at 748: "A plaintiff is not required to identify a similarly situated white comparator to prove her discrimination claim, so long as she can establish an inference of unlawful discrimination through other means."  *See also Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010) ("Plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim."); *Bryant v. Aiken Regional Medical Ctrs.*, 333 F.3d 536, 545 (4th Cir. 2003) (same); *Bowen v. Md. Dep't of Pub. Safety and Correctional Servs.*, RDB-17-1571, 2018 WL 1784463, at *10 (D. Md. Apr. 12, 2018).  On the other hand, the "fourth element is met if 'similarly-situated employees outside the protected class received more favorable treatment.'" *Swaso*, 698 Fed. App'x at 747 (quoting *White v. BFI Waste Services*, 375 F.3d 288, 295 (4th Cir. 2004)).  And, "[w]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination," the plaintiff must demonstrate that the comparator is similarly situated in all relevant respects.  *Swaso*, 698 Fed. App'x at 748; *see Irani v. Palmetto Health*, 767 Fed. App'x 399, 420 (4th Cir. 2019) (per curiam); *Haywood*, 387 Fed. App'x at 359; *Coleman*, 626 F.3d at 191; *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008).

### 4. Rehabilitation Act Principles

The Rehabilitation Act of 1973 is codified at 29 U.S.C. § 791 *et seq.*  Section 504(a) of the Rehabilitation Act, codified, as amended, at 29 U.S.C. § 794(a), provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

The Rehabilitation Act incorporates by reference the "remedies, procedures, and rights" established by Title VI of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000d et seq.), which prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance. 29 U.S.C. § 794a(a)(2). And, § 504 of the Rehabilitation Act is closely related to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and, to "the extent possible, [courts] construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002).

Moreover, the Rehabilitation Act makes it unlawful for employers to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter ...." 42 U.S.C. § 12203(a) (ADA retaliation provision); *see* 29 U.S.C. § 791(f) (incorporating ADA standards in 42 U.S.C. § 12111 *et seq.*). Courts typically apply the standards for Title VII retaliation claims to ADA and Rehabilitation Act retaliation claims. *See Laird v. Fairfax Cty.*, 978 F.3d 887, 893 n.5 (4th Cir. 2020); *S.B. ex rel. A.L. v. Bd. of Educ. of Hartford Cty.*, 819 F.3d 69, 78 (4th Cir. 2016); *Rhoads*, 257 F.3d at 391.

Both the ADA and the Rehabilitation Act "share the same definitions of disability." *Rogers*, 174 F.3d at 433. Title II of the ADA explicitly provides: "The remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures, and rights [that Title II of the ADA] provides to any person alleging discrimination on the basis of disability. . . ." 42 U.S.C. § 12133. And, both statutes "require a plaintiff to demonstrate the same elements to establish liability." *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 461 (4th Cir. 2012); *see Smith v. CSRA*, *Inc.*, 12 F.4th 396, 410 n.4 (4th Cir. 2021) (recognizing that the ADA and the Rehabilitation Act "employ different statutory language" but are construed to 'impose similar requirements'") (citation omitted); *Seremeth v. Board of County Comm'rs*

*Frederick Co.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'") (citation omitted); *Rogers v. Dept. of Health & Env'l Control*, 174 F.3d 431, 433-34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa).

"Disability discrimination and retaliation claims under the ADA and Rehabilitation Act are evaluated under the *McDonnell Douglas* . . . 'pretext' framework." *Perry v. Computer Sciences Corp.*, 429 Fed. App'x 218, 219 (4th Cir. 2011); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) ("Disability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework.") (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 & n.3 (2003)); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) ("Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—courts have routinely used Title VII precedent in ADA cases"); *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 391-92 (4th Cir. 2001) (applying the Title VII framework); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 57-58 (4th Cir.1995) ("[C]ourts routinely have applied the *McDonnell Douglas* paradigm to Rehabilitation Act claims.")

However, despite the general congruence of Title II of the ADA and § 504 of the Rehabilitation Act, a plaintiff must show a different "causative link between discrimination and adverse action" under the two statutes. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999). Under Title II of the ADA, a plaintiff need only prove discrimination "by reason of" disability. 42 U.S.C. § 12132. But, a successful Rehabilitation Act claim requires a showing of discrimination "*solely* by reason of" disability. 29 U.S.C. § 794(a) (emphasis added); *see*

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005) (recognizing that "the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are 'significantly dissimilar.'") (quoting *Baird*, 192 F.3d at 469).

To state a prima facie claim of discrimination under the Rehabilitation Act, the plaintiff must allege that: (1) she is disabled; (2) she was otherwise qualified for the position; and (3) she suffered an adverse employment action *solely* on the basis of the disability. *Perry*, 429 Fed. App'x at 219-20 (citing *Constantine*, 411 F.3d at 498); *see also Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016); *Baird v. Rose*, 192 F.3d 462, 467–70 (4th Cir. 1999); *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 & n. 9 (4th Cir. 1995).

### 5. Title VII: Causation

Counts II and VI are lodged pursuant to Title VII, and assert claims of discrimination on the basis of plaintiff's association with African Americans. Defendant argues that plaintiff has not adequately alleged differential treatment, adequate comparators, or facts that support an inference of racial discrimination. ECF 13-2 at 16-20. Specifically, defendant contends that plaintiff has not adequately alleged that plaintiff's racial association was a "'but for'" cause of her discrimination, or differential treatment of similarly situated employees outside of her protected class. *Id.* at 17 (quoting *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 775 (D. Md. 2010)). Defendant argues the same, albeit more briefly, as to plaintiff's gender-related hostile work claim (Count VI). ECF 13-2 at 17 n.5.[27] Plaintiff counters that she has adequately alleged differential treatment. ECF 18 at 28-30.

---

[27] This section of the Motion specifically mentions plaintiff's gender-related hostile work claim (Count VI). ECF 13-2 at 17 n.5. This section of the Motion does not specifically mention Count I, which is plaintiff's gender discrimination claim, although it does generically refer at one point to plaintiff's "gender discrimination claim" (*id.* at 17), and the same causation argument

"Where a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination," the plaintiff must demonstrate that the comparator is similarly situated in all relevant respects. *Swaso*, 698 Fed. App'x at 748; *see Irani*, 767 Fed. App'x at 420; *Haywood*, 387 Fed. App'x at 359; *Coleman*, 626 F.3d at 191; *Lightner*, 545 F.3d at 265. This includes "that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood*, 387 Fed. App'x at 359 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)); *see Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013), *aff'd*, 576 Fed. App'x 199 (4th Cir. 2014).

Of course, the comparison "'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances.'" *Haynes*, 922 F.3d at 223-24 (citation omitted); *see Irani*, 767 Fed. App'x at 420. But, the prima facie standard does not "require the plaintiff to show that those whom the employer favored and those whom the employer disfavored were similar in all but the protected ways." *Young*, 575 U.S. at 228 (citing *McDonnell Douglas*, 411 U.S. at 802). Nevertheless, "[i]f a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, '[t]he similarity between comparators . . . must be clearly established in order to be meaningful.'" *Swaso*, 698 Fed. App'x at 748 (citation omitted). "'Overall, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken

---

would apply to both plaintiff's gender discrimination claim in Count I and plaintiff's gender-related hostile work claim in Count VI.

together with the other prima facie evidence, would allow a jury to reach an inference of discrimination.'"  *Id.* (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)).

Plaintiff's allegations as to comparators are not always presented in detail.  However, at this stage in the litigation, the allegations "plausibly state a violation of Title VII 'above a speculative level.'"  *Bing*, 959 F.3d at 617 (quoting *Coleman*, 626 F.3d at 190).

Prosa identifies two comparators: Alan Hunsacker and Denise Dickins.  ECF 18 at 31-32.  The Complaint makes some comparisons between plaintiff's treatment and treatment pertaining to Dickins.  *See* ECF 1, ¶¶ 57, 66, 72.  But, the Complaint omits allegations as to Dickins's race or her association with African Americans.  Nor does it make any allegations as to Dickins's disabled status, or her association with a person with a disability.  And, as to gender, Dickins is female.  *Id*. ¶ 57.  Furthermore, the Complaint alleges a significant difference between Dickins and plaintiff, namely that Dickins was "a friend of Meredith's."  *Id*.  This allegation provides an obvious explanation for any alleged disparate treatment between plaintiff and Dickins, *i.e.*, their friendship.  Although such an explanation for favoritism is perhaps not commendable, it is not proscribed by Title VII or the Rehabilitation Act.  Based on the deficiencies identified above, Dickins does not appear to be a valid comparator as to the claims of racial, gender, or disability discrimination.

However, the Complaint does provide a valid comparator by way of Alan Hunsacker, who is alleged to be white, male, and not similarly associated with African Americans.  *Id*. ¶¶ 78, 92.  Furthermore, Hunsacker is alleged to have had "similar or worse performance or disciplinary issues," as compared to plaintiff.  *Id*. ¶¶ 78, 92.  And, although the Complaint does not state outright that Hunsacker's supervisors were also Meredith, Schultz, and Wells, this conclusion is a reasonable inference drawn from the allegations.  *See, e.g.*, *id*. ¶¶ 21, 66.

Plaintiff recounts in the Complaint the harassment and abuse that she suffered, alleges that Hunsacker was "not subjected to similar harassment and abuse," and asserts that he "did not suffer adverse actions like those imposed on plaintiff." *Id*. ¶¶ 66, 72. Likewise, the gender and associational discrimination counts specifically allege that, despite Hunsacker being similarly situated, with similar performance and disciplinary issues, he was "not subject to adverse actions similar to those imposed on plaintiff." *Id*. ¶¶ 78 (gender), 92 (associational discrimination).

Further, the Complaint contains allegations that, even if not sufficient on their own, buttress the comparator claim. For example, the Complaint alleges that plaintiff and the three African American employees were given a "poorly ventilated work space," while Hunsacker was provided a "spacious well-ventilated work space[]." *Id*. ¶ 21. It also asserts that Meredith never addressed plaintiff's "male co-workers in a similarly demeaning manner." *Id*. ¶ 26. And, the suit alleges that plaintiff was isolated and excluded from her regular duties and projects, while "White co-workers . . . did not have duties removed from them by J6 managers and supervisors. Nor were they ostracized and isolated by J6 managers." *Id*. ¶ 28. In addition, plaintiff alleges that after she was assigned a project by Meredith and invested considerable effort in it, Meredith "directed her to give it to a male co-worker who, according to Meredith, needed something to do." *Id*. ¶ 32. Later, plaintiff was chastised by Meredith during her performance appraisal for failing to meet an allegedly undefined deadline, yet the "male co-worker" with whom she had worked jointly on the project "was not censured by Meredith." *Id*. ¶ 39. Moreover, the Complaint alleges that, in contrast to plaintiff, "Employees not in Plaintiff's protected classifications were not unilaterally placed in LWOP status when they already had been pre-approved for leave and where they were eligible for advanced sick leave." *Id*. ¶ 64.

Fourth Circuit decisions upholding motions to dismiss have done so on the basis of allegations that were less robust. *See, e.g.*, *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585-86 (4th Cir. 2015) (conclusory speculation as to why two "non-Black candidates" were selected instead of plaintiff); *Coleman*, 626 F.3d at 190-91 (no plausible basis for believing comparator was similarly situated, nor any allegation of comparable behavior); *Francis*, 588 F.3d at 195-96 (conclusory allegations contradicted by other parts of the complaint).

The Motion also suggests that plaintiff has inadequately alleged that her supervisors were aware of her association with African Americans. ECF 13 at 17.  But, this is incorrect.  The Complaint explicitly asserts that plaintiff's associational relationships with African Americans, including her African American grandchildren, were known to her supervisors and managers.  ECF 1, ¶ 13.  And, it alleges the same as to plaintiff's association with her disabled husband and her caregiving responsibilities.  *Id*. ¶¶ 14-15.

In addition, much of defendant's argument on this issue proffers a view of the alleged incidents that differs from the assertions in the Complaint, and then criticizes plaintiff for not having asserted a comparator for that different version.  *See* ECF 13-2 at 16-20.  For example, defendant contends that plaintiff falsely alleged that she reported an assault to the NSA Police, when she had not done so, and was reprimanded by the LOR for this false allegation.  *Id*. at 18-19. It then argues that plaintiff has failed to allege that Hunsacker was not reprimanded after making a similar false allegation.  *Id*. at 19.  But, this contention is based on defendant's alternative version of facts.  And, at the motion to dismiss stage, the court must accept plaintiff's account, not the account offered by defendant.

Defendant's comparator argument focuses largely on plaintiff's claim of discrimination based on her association with African Americans. But, defendant adopts the same argument as to plaintiff's gender-related hostile work environment claim. *See* ECF 13-2 at 17 n.5. Aside from claiming that plaintiff's comparators are deficient, defendant does not make any other merits argument with regard to plaintiff's gender discrimination or gender-related hostile work claims (Count I and Count VI) or her associational discrimination claim (Count II).

With the exception of plaintiff's negative performance appraisal, defendant does not contest that the incidents asserted by plaintiff constitute "adverse employment actions" within the meaning of Title VII or the Rehabilitation Act. *See id.* at 20-21. Defendant argues that to the extent any of plaintiff's claims rely on the performance appraisal, they should be dismissed. But, plaintiff's claims do not turn on her performance appraisal. Because defendant generally has not attacked plaintiff's case on this ground, and the parties do not discuss this issue in their briefing, I decline to address it further.

Taken together, plaintiff adequately alleges a suitable comparator at the motion to dismiss stage. At this juncture, plaintiff need not establish the elements of a prima facie case. Rather, she must merely allege facts sufficient to "nudge" her discrimination claims "from conceivable to plausible . . . ." *Twombly*, 550 U.S. at 570. To reject plaintiff's comparator allegations as insufficient would amount to an inappropriate parsing of the clear language in her Complaint. Therefore, I shall deny the Motion as to Count I and Count II.

Aside from exhaustion and timeliness, the Motion does not advance any argument as to plaintiff's claim in Count IV for discrimination on the basis of her association with a person with a disability, in violation of the Rehabilitation Act. In a footnote in the Reply, defendant attempts to adopt its arguments as to comparators (*see* ECF 22 at 13 n.3), but this is an improper use of a

Reply. *See, e.g.*, *Clawson*, 451 F. Supp. 2d at 734 ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered."). Therefore, I shall permit Count IV to proceed as well.[28]   I address, *infra*, the hostile work environment claims in Count VI and Count VII.

### 6. Retaliation Principles

As indicated, Title VII contains protections against retaliation by an employer against an employee for engaging in certain kinds of protected activity.  And, the *McDonnell Douglas* proof scheme applies to a retaliation claim.  *CSRA, Inc.*, 12 F.4th at 416.  Thus, "[a] plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the [*McDonnell Douglas*] burden-shifting framework."  *Strothers*, 895 F.3d at 327 (citing *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)).

To state a prima facie claim of retaliation, a plaintiff must allege "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'"  *Okoli*, 648 F.3d at 223 (citation omitted); *see Sempowich*, 19 F.4th at 653; *Roberts*, 998 F.3d at 122; *Kitlinski*, 994 F.3d at 232; *Strothers*, 895 F.3d at 327; *Guessous*,

---

[28]   Drawing all reasonable inferences in plaintiff's favor, the Complaint alleges that coworkers who did not exercise "associational rights," including Hunsacker, were not subject to harassment and abuse, and did not suffer adverse actions like those imposed on plaintiff.  *See* ECF 1, ¶¶ 66, 72.

Under the Rehabilitation Act, a plaintiff must allege that she suffered an adverse employment action *solely* on the basis of disability. *Perry*, 429 Fed. App'x at 219-20 (citing *Constantine*, 411 F.3d at 498). Plaintiff's claim that this was so would seem to be contradicted by her allegations that discrimination on the basis of her gender and her association with African Americans, as well as retaliation, motivated the adverse treatment against her. But, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Therefore, this is not a sufficient basis to dismiss Count IV at this stage.

828 F.3d at 217; *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 Fed. App'x 146, 151 (4th Cir. 2017); *Foster*, 787 F.3d at 250; *Jacobs*, 780 F.3d at 578.

The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see Netter*, 908 F.3d at 937. "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (citation omitted). And, "[c]omplaints raised through internal company procedures are recognized as protected activity." *Roberts*, 998 F.3d at 122. As the Fourth Circuit has said, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citation omitted); *see Laughlin*, 149 F.3d at 259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.") But, "for an employee's activity to constitute protected 'opposition,' she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, and (2) that her conduct in opposition was reasonable." *Netter*, 908 F.3d at 937-38.

The second element is that of an "adverse action."  In general, an adverse employment action is one that adversely affects the terms, conditions, or benefits of employment.  *Roberts*, 998 F.3d at 122.  However, in *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case.  (Emphasis added.)  In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.*; *see also Burlington Northern*, 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."); *Barnes*, 747 Fed. App'x at 119 ("An adverse action need not affect the terms and conditions of employment" in a retaliation claim.)  Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision."  *Strothers*, 895 F.3d at 327.

Nevertheless, there must be "some direct or indirect impact on an individual's employment . . . ." *Adams*, 789 F.3d at 431.  So, "retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68).

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray*, 909 F.3d at 667.  In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).  Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).  But "discharge, demotion, decrease in pay or benefits,

loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions. *Boone*, 178 F.3d at 255.

Judge Grimm explained: "Even with this lower bar [for retaliation], none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an Attendance Warning,' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (internal citations omitted). This passage has been widely cited in this District. *See, e.g.*, *Draughn v. Wormuth*, RDB-20-3625, 2021 WL 5742236, at *8 (D. Md. Dec. 1, 2021); *Kelly v. Berryhill*, RDB-18-0049, 2019 WL 1300816, at *5 (D. Md. Mar. 20, 2019); *Lockley v. Town of Berwyn Heights*, JFM-14-825, 2015 WL 5334256, at *11 (D. Md. Sept. 11, 2015). But, the Fourth Circuit has also ruled that "a letter of warning did amount to an adverse action because [plaintiff's supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination." *Barnes v. Charles Cty. Pub. Schools*, 747 Fed. App'x 115, 119 (4th Cir. 2018) (per curiam)

To establish causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani*, 767 Fed. App'x at 421. The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249. This requirement of but-for causation imposes a higher burden on a plaintiff than the mixed-motive requirement in Title VII's antidiscrimination provision. *See Foster*, 787 F.3d at 249-50.

Nevertheless, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335; *see CSRA*, *Inc.*, 12 F.4th at 417.   Indeed, "'[v]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation].'" *Burgess v. Bowen*, 466 Fed. App'x 272, 283 (4th Cir. 2012) (citation omitted; alterations in *Burgess*); *see CSRA*, *Inc.*, 12 F.4th at 417; *Roberts*, 998 F.3d at 127.   As the Fourth Circuit explained in *Foster*, 787 F.3d at 250-52, "*Nassar* [did] not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim," because it did not require establishing but-for causation at the prima facie stage, and but-for causation is already required at the pretext stage.

"A plaintiff may attempt to demonstrate that a protected activity caused an adverse action [at the prima facie stage] 'through two routes.'"   *Roberts*, 998 F.3d at 123 (quoting *Johnson v. United Parcel Service, Inc.*, 839 Fed. App'x 781, 783-84 (4th Cir. 2021)); *see CSRA*, *Inc.*, 12 F.4th at 417.   "A plaintiff may establish the existence of facts that 'suggest[] that the adverse action occurred because of the protected activity.'"   *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 Fed. App'x at 783-84); *see Lettieri*, 478 F.3d at 650 (recognizing that relevant evidence may be used to establish causation).   Or, a plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity." *Johnson*, 839 Fed. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).   And, "[t]he existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action." *Roberts*, 998 F.3d at 123.

To be sure, "temporal proximity suffices to show a causal relationship."   *Sempowich*, 19 F.4th at 654.   In *Strothers*, 895 F.3d at 335-36, the Court said: "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse

action against the employee soon after becoming aware of such activity." *See also Constantine*, 411 F.3d at 501 ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.") (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

For the temporal route, there naturally must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501. Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id*. (citation omitted). And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n. 5 (4th Cir. 2003)). Moreover, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc*., 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

But, as indicated, temporal proximity is not the sole avenue to allege and later show causation. *CSRA, Inc.*, 12 F. 4th at 417. Rather, temporal proximity is one of two paths to show causation. As noted, the other path contemplates "the existence of facts that 'suggest[] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (citation omitted).

Of import here, the Fourth Circuit has made clear that in a Title VII retaliation case, to establish a causal relationship between the protected activity and an adverse action, "a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts*, 998 F.3d at 124; *see Dowe*, 145 F.3d 657. As a result, if the "decisionmaker is unaware of any prior complaints, a plaintiff 'cannot establish the necessary causal connection'. . . ." *Roberts*, 998 F.3d at 124. And, constructive knowledge is not sufficient. *Id.* at 125. Rather, actual knowledge is required. *Id.*

As discussed earlier, the standards for a Title VII retaliation claim apply to a retaliation claim under the Rehabilitation Act. *See, e.g.*, *Laird*, 978 F.3d at 893 n.5. And, as with a Title VII discrimination claim, at the motion to dismiss stage a plaintiff need not establish a prima facie claim of retaliation. Rather, the plaintiff merely "must allege[] facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing*, 959 F.3d at 617 (quoting *Coleman*, 626 F.3d at 190); *see also Swaso*, 698 Fed. App'x at 747-48; *Woods*, 855 F.3d at 648; *McCleary-Evans*, 780 F.3d at 584.

### 7. Retaliation: Causation

As to Counts III and V, defendant argues that the retaliation claims "fail as a matter of law." ECF 13-1 at 14. Defendant contends that plaintiff has not adequately alleged knowledge and a causal connection for her retaliation claims under Title VII (Count III) and the Rehabilitation Act (Count V). ECF 13-2 at 14-16; ECF 22 at 10-13. I disagree.

It is undisputed that plaintiff engaged in protected activity in November 2016. In particular, the Complaint alleges that plaintiff submitted her initial administrative EEO complaint on November 29, 2016, alleging discrimination in violation of both Title VII and the Rehabilitation Act. ECF 1, ¶ 6. In 2016, she also provided an affidavit in support of a coworker's EEO

Complaint.  *Id*. ¶ 24.  And, plaintiff alleges that on December 22, 2016, Meredith called her to a meeting; prevented her from leaving and injured her, spraining her wrist; and then "aggressively interrogated" her as to her CDG IOPM duties.  *Id*. ¶¶ 46-48.  Of course, defendant contests this version of events.  But, at this stage I must take plaintiff's allegations as true.

In terms of adverse actions, defendant focuses on conduct that it deems "exhausted."  ECF 13-1 at 15; ECF 22 at 10-12.  This is the LOR issued by Wells on April 24, 2017; plaintiff's negative performance appraisal from Meredith on May 18, 2017; and the change in her leave to LWOP on June 15, 2017.  Defendant contends that any evidence of a connection between plaintiff's protected activity and these alleged adverse actions is too attenuated.  However, as I have ruled, it is inappropriate at this juncture to disregard the events that defendant contends have not been exhausted.  As a result, the Court may consider the much wider array of activity alleged in the Complaint as a basis for a retaliation claim, including the meeting of December 22, 2016.

Although "occasional yelling from a boss does not rise to the level of a materially adverse employment action," *Adams v. Upper Chesapeake Med. Ctr., Inc.*, AMD 08-346, 2009 WL 997103, at *4 (D. Md. Apr. 14, 2009), an incident of physical violence certainly could "'dissuade[] a reasonable worker' from engaging in protected activity."  *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68); *see also, e.g.*, *Brokenborough v. District of Columbia*, 236 F. Supp. 3d 41, 59 (D.D.C. 2017) ("[T]hreat of violence . . . could constitute a materially adverse action that would dissuade a reasonable worker from making a charge of discrimination."); *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 404 (E.D.N.Y. 2016) ("Physical assaults can constitute adverse actions for purposes of a retaliation claim.").

The meeting of December 22, 2016, qualifies at this stage as an adverse action.  And, it took place less than one month after plaintiff's protected activity on November 29, 2016.  This is

well shy of the two-month mark at which the Fourth Circuit has said the inference of causation may be significantly weakened.  *King*, 328 F.3d at 151 n.5; *see also Alexander v. Marriott Int'l*, RWT-09-2402, 2011 WL 1231029, at \*13 (D. Md. Mar. 29, 2011) ("This Court and the Fourth Circuit have held that approximately two months may be sufficient temporal proximity to establish a causal relationship.").  Furthermore, the Complaint can be reasonably construed to allege that Meredith was aware of plaintiff's protected activity.  *See, e.g.*, ECF 1, ¶¶ 24, 25, 28, 49, 67, 97, 98, 118.

In addition, defendant argues that any inference of causation must be rejected because plaintiff alleges that she began receiving negative treatment prior to the time that she engaged in any protected activity.  *See* ECF 13-2 at 15-16; ECF 22 at 13.  This is an uncharitable reading of the Complaint.  It is true that "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'"  *Francis*, 452 F.3d at 309 (internal citation omitted).  But, plaintiff alleges that she began engaging in protected activities in "early 2016," when she filed an EEO complaint, and that in March 2016, she "began opposing unlawful employment practices," provided support for the EEO activities of her colleague, Dorea Morrison, and "complained about being required to work in a hostile work environment."  ECF 1, ¶¶ 23-24.  Moreover, she alleges that prior to these activities, she had enjoyed a positive and productive relationship with Meredith and her other supervisors, but that after her protected activities, this ended and the workplace became "hostile and abusive."  *Id*. ¶ 25.  And, most of the alleged actions against her occurred after this point.

According to defendant, based on its investigation, there is no evidence that plaintiff engaged in any "true EEO protected activity" prior to November 2016, and that as a result the

Court should not consider any alleged activity before this point, or should at least require plaintiff to amend her Complaint.  ECF 13-2 at 15 n.4.  But, assuming the truth of the allegations in the Complaint, plaintiff clearly asserts protected activity beginning in "early 2016."  And, I note that the definition of protected activity is broad, and can "encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures."  *Armstrong*, 647 F.2d at 448 (citation omitted).

It is true that plaintiff also alleges problematic behavior by Meredith immediately upon his becoming plaintiff's supervisor in January 2016.  ECF 1, ¶ 20.  It is not clear that this allegation is consistent with the allegation that plaintiff's protected activity prompted Meredith's behavior. Nevertheless, at the motion to dismiss stage, I do not view this as a sufficient basis to prevent plaintiff's retaliation claim from advancing.

In sum, defendant's arguments do not warrant dismissal of plaintiff's retaliation claims.

### 8. Hostile Work Environment Principles

In Court VI and Count VIII, plaintiff asserts hostile work environment claims under Title VII and the Rehabilitation Act.  Under both statutes, to state such a claim, a plaintiff must allege that the conduct of the employer: (1) was unwelcome; (2) resulted because of her gender, race, disability, or prior protected status; (3) was "'sufficiently severe or pervasive' to alter the conditions" of her employment; and (4) was "imputable to [her] employer." *Pueschel v. Peters*, 577 F.3d 558, 565-66 (4th Cir. 2009) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 338 (4th Cir. 2003) (en banc)); *see Roberts*, 998 F.3d at 117; *Evans*, 936 F.3d 183, 192 (4th Cir. 2019); *see also Jessup v. Barnes Group, Inc.*, ___ F.4th ___, 2022 WL 164016, at *5 (4th Cir. Jan. 19, 2022) (stating the same elements for a hostile work environment claim under the ADA).

The Fourth Circuit, like other circuits, has recognized that a claim of retaliatory hostile work environment is a distinct cause of action.  *See Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) ("Retaliatory harassment can constitute adverse employment action ...."), *overruled on other grounds by Burlington Northern*, 548 U.S. at 67-68; *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 600 (D. Md. 2011), *aff'd*, 465 Fed. App'x 274 (4th Cir. 2012); *see also Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (collecting circuit decisions).

The first element, unwelcome conduct, "is not a high hurdle." *Strothers*, 895 F.3d at 328. The Fourth Circuit has explained that "an employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer." *Id.* at 328-29. And, "the nature of the conduct may indicate whether or not the conduct is unwelcome." *Id.* at 329.

To satisfy the second element of a hostile work environment claim, the plaintiff must allege that she was harassed or otherwise discriminated against "because of" her protected class.  42 U.S.C. § 2000e–2; *see also Ocheltree*, 335 F.3d at 331; *First Union Nat. Bank*, 202 F.3d at 242. The plaintiff may satisfy this burden by showing that, "but for" her protected class, she would not have suffered discrimination.  *Id*. at 242.

Animosity may be shown by "differential treatment of similarly situated . . . employees," but "conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment." *Causey*, 162 F.3d at 801-02.  And, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [the plaintiff's protected class], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).

As to the third element, a hostile work environment exists when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult[.]'" *Boyer-Liberto*, 786 F.3d at

281 (some quotations and citation omitted) (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006)); *see Harris*, 510 U.S. at 21; *Nnadozie*, 730 Fed. App'x at 158. The Fourth Circuit has stated that the plaintiff must allege that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22).

The "severe or pervasive" requirement has both subjective and objective components. *See Harris*, 510 U.S. at 21-22; *Jessup*, 2022 WL 164016, at *5; *Roberts*, 998 F.3d at 117; *Perkins*, 936 F.3d at 207-08; *Strothers*, 895 F.3d at 331; *EEOC. v. Cent. Wholesalers Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). In particular, "the plaintiff must show that the work environment was not only subjectively hostile, but also objectively so." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011). And, "[w]hether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *see Irani*, 767 Fed. App'x at 416; *Nnadozie*, 730 Fed. App'x at 158. However, the plaintiff does not need to demonstrate that the work environment is "psychologically injurious." *Boyer-Liberto*, 786 F.3d at 277.

Notably, "viable hostile work environment claims often involve repeated conduct. . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (citation omitted); *see Irani*, 767 Fed. App'x at 416. But, "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto*, 786 F.3d at 277 (alterations in original) (citation omitted).

The Court stated in *Perkins*, 936 F.3d at 208: "'[W]hen determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" (Alteration in original) (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008)). However, "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Perkins*, 936 F.3d at 208 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Likewise, the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment[.]" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted). And, "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable." *Sunbelt Rentals*, 521 F.3d at 315-16 (internal quotation marks and citations omitted); *see Nnadozie*, 730 Fed. App'x at 161-62.

Of import here, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Boyer-Liberto*, 786 F.3d at 278 (citation omitted); *see also E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'") (citation omitted); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

At bottom, the determination as to "severe and pervasive" is not, and "'by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Consequently, "no single factor is dispositive, as the real social impact of workplace behavior

often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23, and *Oncale*, 523 U.S. at 81-82) (cleaned up).

### 9. Severe or Pervasive Standard

Count VI alleges hostile work environment based on gender, race, and retaliation, in violation of Title VII (*id*. ¶ 126), and Count VII alleges hostile work environment based on disability and retaliation, in violation of the Rehabilitation Act (*id*. ¶ 134).  Defendant does not contest the first and fourth prongs of the hostile work environment standard, namely that the conduct in question was unwelcome to plaintiff, and that it was imputable to defendant.  But, defendant argues that the harassment alleged by plaintiff, on whatever basis, is not sufficiently "severe or pervasive."  ECF 13-2 at 21-23.

Again, defendant focuses solely on the incidents described in the September 2017 EEO Complaint.  *See id*. at 22.  As I have said, this is incorrect at this stage.  In addition, where "an act contributing to [a hostile work environment] claim occurs within the filing period"—as is undisputed here—"the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

Many of the alleged events contributing to the claims are inadequate by themselves.  For example, plaintiff alleges that she was moved to a poorly ventilated space (ECF 1, ¶ 21); that Meredith "screamed" at plaintiff and sent her "derogatory" emails (*id*. ¶ 26); that he insisted on certain certification requirements (*id*. ¶¶ 27, 30, 40); that he deprived her of her responsibilities and ignored her work submission (*id*. ¶¶ 28, 32, 34, 41); that he suggested a job elsewhere (*id*. ¶

38); and that he gave her a negative performance review, albeit one that was later corrected (*id*. ¶¶ 55-56). In general, these allegations are best described as the "callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor," which the Fourth Circuit has said are "not actionable." *Sunbelt Rentals*, 521 F.3d at 315-16 (internal quotation marks and citations omitted).

However, a hostile work environment claim must be judged in its totality. *See Perkins*, 936 F.3d at 208; *Sunbelt Rentals*, 521 F.3d at 315. And, there are two alleged incidents in particular that, in my view, nudge plaintiff's hostile work environment claims across the line to plausibility.

The first is the physical altercation with Meredith. As alleged, as part of this encounter, Meredith prevented plaintiff from leaving the meeting room and injured her, and then allegedly "interrogated" her "aggressively" as to her CDG IOPM duties. *Id*. ¶¶ 46-48. Because of Meredith's conduct, plaintiff sprained her wrist. *Id*. ¶ 48. A physical event of this sort is of a different caliber than some of the other alleged incidents, which may more readily be dismissed as a routine personality conflict. Indeed, in *Perkins*, 936 F.3d at 208 (emphasis added), the Fourth Circuit noted that whether the alleged conduct was "*physically threatening* or humiliating, or a mere offensive utterance," was one of the factors courts must consider when evaluating hostile work environment claims. And, in *Thorn*, 766 F. Supp. 2d 585, one of the cases cited by defendant for its argument, the court noted that not only had the plaintiff's supervisors "treated him with civility," but that there "were no physical threats." *Id*. at 600.

The second relevant incident is plaintiff's allegation that she had confided in the facility's chaplain, but that her "managers and supervisors" were "taking advantage" of this relationship to obtain "confidential information that Plaintiff had disclosed to the chaplain." ECF 1, ¶ 35. As

73

alleged, this amounts to a substantial infringement on plaintiff's expectations of privacy and confidentiality, again of a different character than more common workplace conflict.

In addition, the Fourth Circuit has said that, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Boyer-Liberto*, 786 F.3d at 278 (citation omitted); *see also E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'") (citation omitted). Here, all alleged harassment occurred on the part of Meredith and plaintiff's other supervisors, who were in positions of power over plaintiff, as opposed to conduct by coworkers. Furthermore, this conduct is alleged to be reasonably frequent, another factor the court must consider. *See Perkins*, 936 F.3d at 208.

In defendant's arguments contesting causation as to plaintiff's other claims, defendant also challenged causation as to the hostile work environment claims. I have already addressed the issue of causation. And, defendant has not contested the other two prongs of a hostile work environment claim.

In sum, plaintiff describes a series of incidents between January 2016 and the summer of 2017, including several particularly severe periods, such as in December 2016 and January 2017. *See* ECF 1, ¶¶ 44-52. Therefore, she has plausibly alleged a work environment that "would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22). Accordingly, I shall deny the Motion as to Count VI and Count VII.

## V.  Conclusion

In summary, I have found that defendant's arguments as to timeliness and exhaustion are not sufficient, at the motion to dismiss stage, to warrant dismissal of the suit.  And, on the merits, I have found that plaintiff has adequately alleged causation for both her discrimination and retaliation claims, as well as a severe or pervasive hostile work environment.

For the reasons stated above, I shall grant the Discovery Motion; construe the Motion as a motion to dismiss; and deny the Motion.

An Order follows, consistent with this Memorandum Opinion.


Date:   February 8, 2022                        _____/s/_____
                                                Ellen L. Hollander
                                                United States District Judge